**LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs,**

v.

**Peter J. BRENNAN, Secretary of the United States Department of Labor, et al., Defendants.**

**No. C-73-0282 AJZ.**

United States District Court,
N. D. California.

June 20, 1974.

Stephen E. Ronfeldt, Russell W. Galloway, Jr., Henry Hewitt, Legal Aid Society of Alameda County, Oakland, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., Richard F. Locke, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

Executive Order 11246, issued September 24, 1965,[1] requires companies that hold federal contracts to:

take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin.

This case involves important questions concerning the enforcement of this executive order and the scope of judicial review of individual governmental agencies' actions taken in its enforcement. Plaintiffs move for partial summary judgment and an order requiring the United States Department of Agriculture [USDA] and the persons within the USDA responsible for enforcing the executive order to refrain from approving affirmative action programs of contractors assigned to the USDA in Alameda County, California, which do not comply with the regulations that set out the requirements of an adequate affirmative action program. Before considering the narrow questions presented by this mo-

tion, it is necessary to review the history of this litigation, the executive order and regulations at issue, and consider defendants' objections to the court's jurisdiction.

### I

Plaintiffs' original complaint filed in this action in February, 1973, contained four claims for relief, seeking: (1) to compel defendants to release information on the ethnic composition of the work forces of the Alameda County contractors subject to Executive Order 11246; (2) to require the USDA to disclose the affirmative action programs and compliance review reports of Alameda County contractors assigned to the USDA for enforcement purposes; (3) to require defendants responsible for these programs within the USDA to enforce the requirements of Executive Order 11246 and the regulations and orders issued pursuant to the executive order; and (4) to direct the Secretary of Labor and the Director of the Office of Federal Contract Compliance [OFCC], who delegated enforcement responsibility to the USDA, to require the USDA to comply

1. Executive Order 11246 is the latest in a series of executive orders going back over 30 years which were designed to promote equal employment opportunities for minority groups by requiring federal contractors to include nondiscrimination provisions in their contracts with the government. The first such executive order was issued by President Franklin D. Roosevelt on June 25, 1941. Executive Order 8802, 6 Fed.Reg. 3109 (1941). It ordered: "All contracting agencies of the Government of the United States shall include in all defense contracts hereafter negotiated by them a provision obligating the contractor not to discriminate against any worker because of race, creed, color, or national origin . . . ." The order also set up a Committee of Fair Employment Practices to investigate complaints of discrimination in violation of the order and take appropriate steps to redress valid grievances.

The order was continued in substantially the same form by President Truman in 1945 and 1951, Executive Orders 9664 and 10308, 10 Fed.Reg. 15301 (1945) and 16 Fed.Reg. 12303 (1951); and by President Eisenhower in 1953, Executive Order 10479, 18 Fed.Reg. 4899 (1953), although primary responsibility

for obtaining compliance with the nondiscrimination provisions was imposed on the heads of the various contracting agencies. On March 6, 1961, President Kennedy issued Executive Order 10925, 26 Fed.Reg. 1977 (1961), which established the President's Committee on Equal Employment Opportunity. The order for the first time required the contractors to take affirmative action to ensure nondiscrimination and established sanctions and penalties for noncompliance. Executive Order 11246, presently in effect, was issued by President Johnson, 30 Fed. Reg. 12319 (1965), and transferred responsibility for its implementation to the Secretary of Labor. Executive Order 11246 was amended by Executive Order 11375, 32 Fed. Reg. 14303 (1967), issued October 13, 1967, to include discrimination on the basis of sex within its nondiscrimination provisions. More detailed discussions of this history are contained in Farmer v. Philadelphia Electric Co., 329 F.2d 3, 5–7 (3d Cir. 1964), and Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 168–171 (3d Cir.), cert. denied, 404 U.S. 854, 92 S. Ct. 98, 30 L.Ed.2d 95 (1971). The text of Executive Order 11246, as amended, may also be found at 42 U.S.C.A. § 2000e, note.

with the executive order and corresponding regulations.

Named as defendants were Peter J. Brennan, Secretary of the Department of Labor, who is responsible for the overall administration of Executive Order 11246, and who is required to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes" of the executive order;[2] Philip J. Davis, Director of the OFCC, to whom the responsibility for enforcing the executive order has been delegated;[3] Earl L. Butz, Secretary of the USDA, to which primary enforcement responsibility for federal contractors engaged in farming, the provision of agricultural services, suppliers of food and kindred products, tobacco manufacturers, and certain businesses in the wholesale food trade have been assigned;[4] and, finally, William Gladden, Chief of the Contract Compliance Division of the USDA's Office of Equal Opportunity, who is ultimately responsible for enforcement within the USDA.

Plaintiffs originally included the Alameda Legal Aid Society, a federally funded law project which represents low income minority persons in Alameda County, California, and which has a compliance project designed specifically to secure the enforcement of laws relating to equal employment opportunity; the director of the project; four unemployed minority persons who have sought employment at businesses which come within the compliance requirements of the executive order and regulations issued thereunder; and the Western Regional Job Council, an unincorporated association in Oakland, California, whose primary concern is the employment of minority persons.[5]

With respect to the third and fourth claims for relief, plaintiffs contend that defendants have failed to enforce Executive Order 11246 and the regulations issued pursuant to it in two respects: (1) they have failed to undertake any review whatsoever of the affirmative action programs of the majority of federal contractors, and (2) that where they have reviewed programs, they have approved ones which fail to comply with the executive order and regulations. Their motion for partial summary judgment deals only with the second contention.

These claims were previously the subject of defendants' motions to dismiss for lack of subject matter jurisdiction

2. Exec.Order No. 11,246 § 201, 3 C.F.R. 169, 170 (1974).

3. *See* 41 C.F.R. § 60–1.2 (1973).

4. Fifteen federal agencies including the USDA have been designated as "compliance agencies" by the OFCC and assigned compliance responsibilities under Executive Order 11246 for specific industries according to the categories of the Standard Industrial Code. The OFCC regulations make each such agency primarily responsible for obtaining compliance with the executive order and regulations issued by the OFCC. *See* 41 C.F.R. § 60–1.6 (1973).

5. The initial stages of this litigation involved plaintiffs' attempts to obtain disclosure of the EEO–1, or ethnic composition reports for those nonconstruction federal contractors in Alameda County which are subject to Executive Order 11246; and the written affirmative action programs and compliance review reports of federal contractors with establishments in Alameda County that are assigned to the USDA for enforcement purposes. For the most part these disclosure claims have been resolved through settlement negotiations between the parties. As a result, plaintiffs have now agreed to dismiss the Legal Aid Society of Alameda County and its executive director as plaintiffs.

Since the original complaint was filed, plaintiffs have filed two amended complaints adding the United States Postal Service and General Services Administration and their officials responsible for administration of Executive Order 11246 as defendants and raising the same issues against them as are asserted against the USDA. Certain labor unions associated with the provision of trucking services to the Postal Service have also been added as defendants. In conjunction with these additional claims, two individuals and the National Association for the Advancement of Colored People have been permitted to intervene as plaintiffs. None of these additional parties is involved in plaintiffs' motion for partial summary judgment presently before the court.

and failure to state a claim upon which relief can be granted on the grounds of sovereign immunity, nonreviewability of discretionary agency action, and failure of plaintiffs to exhaust their administrative remedies. These motions were denied by the court May 31, 1973, but they have since been renewed by defendants, and their arguments are discussed more fully below.

Following the denial of defendants' motions to dismiss, plaintiffs obtained the affirmative action programs of some 27 USDA assigned contractors in Alameda County which were reviewed and approved during the period from August, 1972, through January, 1973. Following receipt of these programs, plaintiffs reviewed them and sent the USDA a lengthy and detailed memorandum specifying their claims that the programs as approved were in violation of the applicable regulations, specifically Revised Order Number 4, 41 C.F.R. Part 60–2 (1973), entitled, "Affirmative Action Programs." When no response was made, plaintiffs discussed the issues raised with an attorney from the Department of Labor. Finally, after waiting over two months, plaintiffs brought the motion for partial summary judgment now pending before the court. As initially presented, the motion sought to restrain the USDA from approving affirmative action programs that are not in compliance with Executive Order 11246 and the regulations issued thereunder. A nationwide scope of relief was requested.

Since the motion was presented, the court has held two hearings and granted additional time for the USDA to present materials showing its compliance efforts. The USDA has since conducted or is conducting followup onsite reviews of all the contractors directly involved and issued a number of show cause orders.[6] Plaintiffs have narrowed the relief sought to include directions to dis-

approve the affirmative action programs of Alameda County contractors whose programs are shown to be in noncompliance with Revised Order Number 4, and to require of the USDA that any future approvals in Alameda County, comply with the Order. The relief sought includes a means of monitoring the USDA's operations by plaintiffs and the court. It is anticipated that if they succeed on this motion, plaintiffs will submit materials showing that the USDA's failings locally are duplicated elsewhere justifying nationwide relief. For the moment, however, the USDA's activities in Alameda County are directly under consideration. Before turning to the merits of plaintiffs' motion, the court will consider the procedural and other objections to the court's jurisdiction postulated by defendants.

## II

It is important to distinguish at the outset that the basis of this action is not the claims of individuals against specific contractors for failure to employ them in a certain job; rather it is an action seeking relief in the nature of mandamus to require federal officers to perform specific and clearly defined duties mandated by Executive Order 11246 and the regulations promulgated pursuant to the executive order.

Defendants argue that a mandamus action is inappropriate here under either the mandamus statute, 28 U.S.C. § 1361, or the Administrative Procedure Act, 5 U.S.C. §§ 701–706, because the acts which plaintiffs seek to compel are committed to the discretion of the agencies involved, because this action is barred by the doctrine of sovereign immunity, and because Executive Order 11246 does not create a private cause of action.

Defendants' principal contention is that Executive Order 11246 is not mandated by any Act of Congress or the

---

6. Upon a finding that a contractor has an unacceptable affirmative action program, the compliance agency is required to issue a notice to the contractor giving him 30 days to show cause why enforcement proceedings under section 209(b) of Executive Order 11246 should not be instituted. 41 C.F.R. § 60–2.2(c) (1973).

Constitution, which therefore makes all federal agency actions taken pursuant to it discretionary and nonreviewable. On the other hand, executive orders clearly carry the force and effect of law if they are issued pursuant to constitutional or statutory authority. This particular executive order and its direct antecedents have consistently been held to be based on statutory authority resting with the President to provide for procurement, utilization, and management of government property. Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 166–171 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 n.1 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967).[7] There is no question that Executive Order 11246 also has firm foundations in the fifth and fourteenth amendments to the Constitution and the several congressional enactments, including the comprehensive provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., intended to provide equal employment opportunities. This basis for Executive Order 11246 is implicitly recognized by defendants when they urge that plaintiffs be restricted to the procedures provided by the Civil Rights Act of 1964.

In contrast, the authorities relied upon by defendants, for example, Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (D.C.Cir.1965), involve executive orders which essentially deal with "housekeeping" functions strictly within the purview of the executive department. Gronouski involved the recognition status for federal employee organizations. As the court pointed out:

Executive Order 10988 represents in essence a formulation of broad policy by the President for the guidance of federal employing agencies. It had no specific foundation in Congressional action, nor was it required to effectuate any statute. It could have been withdrawn at any time for any or no reason. It represented simply one President's effort to move in the direction of what he had been advised by his experts would be an improvement in the efficiency of federal employment.

350 F.2d at 456. The history of Executive Order 11246 and its basis in the constitutional and statutory provisions noted above make Gronouski wholly distinguishable from this action.

■ Hence, the court concludes that Executive Order 11246 was issued pursuant to constitutional and statutory authority, and has the full force and effect of law. It is axiomatic that regulations issued pursuant to such an executive order also carry the force and effect of law. Vitarelli v. Seaton, 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

Next, defendants urge that whatever effect these regulations have, approval and review of federal contractor's affirmative action programs are not mandatory, but discretionary duties, which are unenforceable in a mandamus-type proceeding.

This argument is amply refuted by the language of the regulations themselves. As noted above, Executive Order 11246 requires companies having federal contracts to:

take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin.

§ 202(1), 3 C.F.R. 169, 170 (1974). The requirements of this "affirmative action" are spelled out in detail in regulations issued by the OFCC, which also set

7. Thus, in issuing Executive Order 11246 on September 24, 1965, President Johnson declared in a preface to the order that the order was issued "[u]nder and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States." Exec.Order No. 11,246, 3 C.F.R. 169, 170 (1974).

forth the responsibilities of the enforcement agency. These duties include requiring certain federal contractors to adopt affirmative action programs:

> (a) *Requirement of programs.* Each agency . . . shall require each prime contractor who has 50 or more employees and a contract of $50,000 or more . . . to develop a written affirmative action compliance program for each of its establishments.

41 C.F.R. § 60–1.40 (1973). Revised Order Number 4, 41 C.F.R. Part 60–2 (1973), then sets forth the detailed requirements governing the contents of these affirmative action programs and the steps which the compliance agency must take whenever a contractor's program does not satisfy the requirements of Revised Order Number 4. 41 C.F.R. § 60–2.2(c) (1973) requires the compliance agency to initiate enforcement proceedings immediately when a contractor's program is found insufficient or nonexistent:

> (c) Immediately upon finding that a contractor has no affirmative action program or has deviated substantially from an approved affirmative action program or that his program is not acceptable the contracting officer, the compliance agency representative or the representative of the Office of Federal Contract Compliance, whichever has made such a finding, shall notify officials of the appropriate compliance agency and the Office of Federal Contract Compliance of such fact. The compliance agency shall issue a notice to the contractor giving him 30 days to show cause why enforcement proceedings under section 209(b) of Executive Order 11246, as amended, should not be instituted.

See also 41 C.F.R. §§ 60–1.20(c), 60–2.1 & 60–2.2(a) (1973).

As pointed out by the District of Columbia circuit in Adams v. Richardson, 156 U.S.App.D.C. 267, 480 F.2d 1159 (D.C.Cir. 1973), the agency discretion exception to the general rule that agency action is reviewable is a narrow one, applicable only where the statute and regulations are so broadly drawn there is no law to apply. *Id.* at 1161–1162. Executive Order 11246 and the regulations issued thereunder provide detailed and specific guidance to determine the required content of affirmative action programs, and even these regulations have been further explicated by the OFCC.[8]

■ Furthermore, the appropriate compliance agency response is provided for in affirmative and mandatory language, as set out above. Under these circumstances, defendants are charged with an enforceable legal duty to disapprove affirmative action programs which do not comply with Revised Order Number 4.

Nevertheless, defendants argue the actions taken by the OFCC and the USDA are not reviewable in this court because this is an unconsented suit against the United States and barred by the doctrine of sovereign immunity. Larson v. Domestic & Foreign Corp. 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Dugan v. Rank, 372 U.S. 609, at 620, 83 S.Ct. 999, at 1006, 10 L.Ed.2d 15 (1963), states the doctrine as follows:

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." (citations omitted)

■ Therefore, this suit is barred by the doctrine of sovereign immunity un-

---

8. On February 22, 1974, Philip J. Davis, Director of the Office of Federal Contract Compliance, United States Department of Labor, signed and promulgated to the compliance agencies "Technical Guidance Memo No. 1 on Revised Order No. 4," the relevant portions of which are cited by the court where applicable to the interpretation of certain sections of Revised Order Number 4, *infra.*

less it falls within one of the exceptions recognized by these same cases. Plaintiffs' main contention is that the OFCC and the USDA officers have taken improper action and failed to act where clearly required to do so by regulations having the force and effect of law in approving programs which violate the requirements of Revised Order Number 4. Such a claim clearly falls within the ultra vires exception to the bar of sovereign immunity. As stated in *Larson*:

> where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief.

337 U.S. at 689.

Since plaintiffs allege that the federal defendants have violated a plain legal duty imposed by valid regulations properly issued, and since whatever burden which might be imposed on the federal officials involved is outweighed by the gains anticipated through vigorous enforcement of Executive Order 11246,[9] the court has jurisdiction to review the challenged actions of these government officials on the merits pursuant to 5 U. S.C. §§ 701–706; 28 U.S.C. § 1361; and 28 U.S.C. § 1331.[10] *See* State of Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969) (ultra vires exception applies where plaintiffs alleged federal officials acted beyond their delegated authority by violating a plain legal duty). *See also* Adams v. Richardson, *supra*.

Finally, defendants argue that the executive order does not create a private right of action against either government officials or private contractors, relying on Blaze v. Moon, 440 F.2d 1348 (5th Cir. 1971); Gnotta v. United States, 415 F.2d 1271 (8th Cir. 1969), cert. denied, 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970); Farkas v. Texas Instrument, Inc., *supra*; Farmer v. Philadelphia Electric Co., 329 F.2d 3 (3d Cir. 1964); and CORE v. Commissioner, 270 F.Supp. 537 (D.Md.1967). These cases were private suits by individuals seeking relief from or employment with

---

9. Footnote 11 of the Court's opinion in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 691 n. 11, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), announces what several courts have interpreted as an exception to the ultra vires exception to the doctrine of sovereign immunity:

> 11. Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. North Carolina v. Temple, 134 U.S. 22, 10 S.Ct. 509, 33 L.Ed. 849 (1890).

The ninth circuit has not interpreted this footnote to mean that a suit must fail if, as here, portions of the relief sought "require affirmative action by the sovereign." State of Washington v. Udall, 417 F.2d 1310, 1317 (9th Cir. 1969). Instead such suits must be dismissed as suits against the government only where "the relief sought would work an intolerable burden on governmental func-

tions, outweighing any consideration of private harm." *Id.* at 1318.

In this case, the USDA officials involved have previously indicated their willingness to abide by the newly issued Technical Guidance Memo from the OFCC which incorporates the interpretation of Revised Order Number 4 that plaintiffs advocate. Thus, the relief requested will not work any intolerable burden on these officials. Moreover, vigorous enforcement of the executive order and regulations should produce significantly expanded employment opportunities for minority groups and women, and to the extent that truly equal employment opportunities are created, all elements of the population and the government itself will benefit. Hence, footnote 11 of the *Larson* opinion does not create any additional obstacle to either the court's jurisdiction or the relief sought by plaintiffs.

10. Since the employment opportunities that would be provided by strict enforcement of the executive order and regulations have a value well in excess of $10,000, jurisdiction also exists under the general federal question statute.

specific government contractors, using various theories employing Executive Order 11246. The present action, however, is a suit against the officials of the federal compliance agencies to require them to comply with their statutory enforcement duties. *See* Adams v. Richardson, *supra*. None of the plaintiffs in this action seeks a particular job with a specific contractor. Indeed, the action is solely directed against federal officials vested with enforcement duties under Executive Order 11246. Without indicating any approval of the holdings in those cases cited by defendants, they are simply inapplicable to this action.

### III

Defendants also argue that plaintiffs have failed to exhaust their administrative remedies set out in 41 C.F.R. § 60–1.21 et seq. (1973). The regulations in question provide that, "[a]ny employee of any contractor or applicant for employment with such contractor may, . . . file in writing a complaint of alleged discrimination in violation of the equal opportunity clause." 41 C.F.R. § 60–1.21 (1973). The regulations go on to prescribe the proper place to file the complaint, § 60–1.22, its contents, § 60–1.23, procedures for investigating and informally resolving the complaint, § 60–1.24, hearings in appropriate cases, § 60–1.26, and authority where necessary to impose the sanctions described in subsections 209(a)(1), (5), and (6) of Executive Order 11246, which include cancellation of government contracts. 41 C.F.R. § 60–1.27 (1973). *See also* 41 C.F.R. § 60–1.26(b)(2)(v) (1973). It is undisputed that none of the named plaintiffs have filed such complaints against any of the 29 contractors[11]

whose affirmative action programs are before the court.

■ Defendants' argument, however, is based on a misconception of the nature of this action which was discussed previously in considering defendants' claim that no private right of action exists under the executive order. Plaintiffs have steadfastly insisted, and the court is persuaded, that the crux of this action is not complaints of specific acts of discrimination against the named private contractors. Rather, it is based upon the failure of the federal compliance agencies to require federal contractors to undertake meaningful affirmative action in the employment of minorities and women. The complaint procedure outlined above is designed only to deal with complaints by individuals against the actions of specific companies. The regulations contain no administrative procedures for challenging the actions of the federal enforcement agencies themselves. There are no remedies for plaintiffs to exhaust in this area.

Nevertheless, plaintiffs did file an extensive memorandum with exhibits attached with defendants on September 5, 1973, to which defendants have made no direct response. The memorandum specifically presented plaintiffs' claims that the 27 (now 29) affirmative action programs were deficient in virtually every significant respect. These claims form the substance of plaintiff's subsequently noticed motion for summary judgment, to which the court now turns.

### IV

The essence of plaintiffs' motion for partial summary judgment is that each of the 29 affirmative action programs[12]

11. See note 12, *infra*.

12. As noted above, defendants originally supplied plaintiffs with 27 affirmative action programs approved by the USDA for Alameda County contractors during 1972–1973. In response to this motion for summary judgment, defendants submitted additional materials in connection with the 27 programs

previously supplied and two additional programs of Alameda County contractors approved during the same general time period —Coca-Cola Bottling Co. and Sunshine Biscuits, Inc. Plaintiffs then modified their claims for relief to include all 29 of the affirmative action programs which are before the court.

approved by the USDA in Alameda County during the period from August, 1972, to January, 1973, was in violation of the legal requirements for such programs as set out in the applicable regulations, particularly Revised Order Number 4, 41 C.F.R. Part 60–2 (1973).

 Since defendants admit that the affirmative action programs of all 29 contractors were initially reviewed and approved by the USDA during the period specified above, the remaining issues before the court are: (1) whether the programs so approved were in substantial compliance with Revised Order Number 4, and (2) if not, whether the failure of the USDA to enforce the regulations and orders issued pursuant to Executive Order 11246, is excusable, precluding entry of summary judgment and the relief sought by plaintiffs.

Plaintiffs have made a thorough and convincing showing that each of the 29 affirmative action programs approved by the USDA for Alameda County contractors is in violation of the regulations in one or more of the following respects: (1) they contain inadequate utilization analyses which are designed to show each job category in which the contractor is deficient in the utilization of minority persons and women, 41 C.F.R. § 60–2.11 (1973), (2) they fail to establish adequate goals and timetables designed to correct each deficiency within the minimum period necessary, 41 C.F.R. §§ 60–2.10, 60–2.12 & 60–1.20(b) (1973); and (3) they fail to include additional ingredients required by Revised Order Number 4, 41 C.F.R. § 60–2.13 (1973).

13. This utilization analysis must be done for every minority group exceeding 2% or more of the labor area and women. Technical Guidance Memo, *supra*, at (4) Underutilization Analysis.

14. 41 C.F.R. § 60–2.11(a) (1973) provides:
(1) In determining whether minorities are being underutilized in any job classification the contractor will consider at least all of the following factors:

*1. Inadequate Utilization Analyses*

Revised Order Number 4 requires that each affirmative action program contain a detailed and specific utilization analysis showing each job category in which the contractor is deficient in the utilization of minorities and women.[13] The relevant portion of the regulation provides:

Affirmative action programs must contain the following information:

(a) An analysis of all major job classifications at the facility, with explanation if minorities or women are currently being underutilized in any one or more job classifications (job "classification" herein meaning one or a group of jobs having similar content, wage rates and opportunities). "Underutilization" is defined as having fewer minorities or women in a particular job classification than would reasonably be expected by their availability. In making the work force analysis, the contractor shall conduct such analysis separately for minorities and women.

41 C.F.R. § 60–2.11 (1973).

This utilization analysis is the basic element of the affirmative action program since it identifies the job categories in which more minorities and women must be hired in order to meet the affirmative action requirements of Executive Order 11246. Plaintiffs contend that by virtue of the eight separate factors required by Revised Order Number 4 to be considered by the contractor in determining whether minorities or women are being underutilized in any job classification,[14] a proper utilization anal-

(i) The minority population of the labor area surrounding the facility;
(ii) The size of the minority unemployment force in the labor area surrounding the facility;
(iii) The percentage of the minority work force as compared with the total work force in the immediate labor area;
(iv) The general availability of minorities having requisite skills in the immediate labor area;

ysis by a contractor requires five stages: first, a determination of the appropriate labor area; second, a factual analysis of each of the eight factors; third, based on that analysis, a determination of the availability of minorities and women for employment within that category; fourth, the contractor must set forth the ethnic and sexual composition of his current work force within that category; and fifth, if the percentage of minorities or women available in any category exceeds the percentage of minorities or women employed in that category, the contractor must designate that category as a deficiency category. Plaintiffs concede that most of the affirmative action programs submitted contain the fourth stage—the ethnic and sexual composition of the contractor's work force. However, they claim none of the programs contains an adequate analysis of the other four stages.

Plaintiffs first contend that the Alameda County contractors define the appropriate labor area to minimize the available minority percentages, and that they use inconsistent and contradictory definitions of the relevant labor area. For example, Southern Alameda County contractors frequently exclude the predominately urban nonwhite areas in the northern part of the county within commuting distance from the labor area definition, while the Northern Alameda County contractors define the relevant labor area as the entire San Francisco-Oakland Standard Metropolitan Statistical Area (SMSA) [15] which contains a lower minority population than the local area. Some of the programs contain no definition of the relevant labor area.

Defendants do not deny that the definitions of relevant labor areas approved are contradictory or that they minimize the minorities available. They claim only that plaintiffs are seeking a definition of the labor area which exaggerates the relevant minority population. Revised Order Number 4 requires that the contractor use the "immediate labor area" or the "labor area surrounding the facility" to define the relevant labor area. 41 C.F.R. § 60-2.11 (1973). As explicated by defendant Davis, "Both terms refer to the local area within which the contractor can reasonably expect people to commute." Statement of Philip J. Davis, Director, OFCC, issued August 8, 1973. Defining the labor area as roughly the commuting area thus substantiates plaintiffs' position that defendants have uniformly approved definitions both overinclusive and underinclusive which raise serious questions about the minority percentages obtained thereby.

Defendants do not dispute plaintiffs' contention that none of the USDA approved programs contains an analysis of the eight factors for any job category, a contention which receives support from the OFCC's own "Technical Guidance Memo No. 1 on Revised Order No. 4." [Technical Guidance Memo] [16] For

(v) The availability of minorities having requisite skills in an area in which the contractor can reasonably recruit;
(vi) The availability of promotable and transferable minorities within the contractor's organization;
(vii) The existence of training institutions capable of training persons in the requisite skills; and
(viii) The degree of training which the contractor is reasonably able to undertake as a means of making all job classes available to minorities.
41 C.F.R. § 60-2.11(a)(2) (1973) requires the contractor to consider the same eight factors in determining whether women are being underutilized in any job classification.

15. The San Francisco-Oakland SMSA includes all of San Francisco, Contra Costa, Marin, and San Mateo Counties.

16. Defendants object to any reliance on the Technical Guidance Memo, issued February 22, 1974, (see note 8, *supra*) to show that the Alameda County programs were in noncompliance with Revised Order Number 4 and therefore illegal when approved by the USDA, since the Technical Guidance Memo was promulgated subsequent to the approvals in question. The Technical Guidance Memo, however, does not purport to be anything more than a clarification of the standards contained within Revised Order Number 4 which have been in effect throughout the

example, the Memo states that the required utilization analysis should include "evaluation of opportunities through training and recruitment" as part of an expanded concept of occupational availability.[17]

None of the programs approved by USDA contains a determination of the specific availability of minorities and women for each job category as required by 41 C.F.R. § 60–2.11(a) (1973) and *Technical Guidance Memo*, at (3) Availability Analysis, a fact that is not disputed by defendants.

Defendants also do not dispute that none of the approved affirmative action programs identify those job categories where, after the availability of minorities and women is compared with the actual ethnic and sexual composition of the contractor's work force, underutilization is actually found to exist. 41 C.F.R. § 60–2.11(a) (1973); *Technical Guidance Memo*, at (4) Underutilization Analysis. This identification is essential to the establishment of specific goals for each such underutilization, the next general requirement of Revised Order Number 4.

### 2. *Improper Goals and Timetables*

Revised Order Number 4 requires that contractors' affirmative action programs contain a number of goals and timetables designed to correct each deficiency in utilization of minorities and women within the minimum feasible period. These requirements are first set out in 41 C.F.R. § 60–2.10 (1973):

An acceptable affirmative action program must include . . . goals and timetables to which the contractor's good faith efforts must be directed to correct the deficiencies and, thus to increase materially the utilization of minorities and women, at all levels and in all segments of his work force where deficiencies exist.

*See also* 41 C.F.R. § 60.2.12(g) (1973).[18] Revised Order Number 4 makes it incumbent upon the contractor to assert "every good faith effort" in designing the goals:

Thus, in establishing the size of his goals and the length of his timetables, the contractor should consider the results which could reasonably be expected from his putting forth every good faith effort to make his overall affirmative action program work.

41 C.F.R. § 60–2.12(a) (1973). *See also* 41 C.F.R. § 60–1.20(b) (1973).

Plaintiffs contend that these regulations require the establishment of both an ultimate goal—correction of the deficiency—and adequate intermediate goals—specific commitments to demonstrate the contractor's good faith efforts at achieving the ultimate goal.

Most of the affirmative action programs approved fail to establish any ultimate goal. Instead they generally establish a one year numerical hiring goal based upon the contractor's own projections of job openings during the coming year. Plaintiffs contend that these annual goals are inadequate in that they

period when the approvals were granted. To this extent, it merely supports plaintiffs' position regarding what Revised Order Number 4 always required, and indicates that the USDA applied improper standards and criteria under Revised Order Number 4.

Plaintiffs' showing is complete without any need to resort to the Technical Guidance Memo, and some of the deficiencies cited by plaintiffs are independent of any particular set of standards, for example, the USDA's approval of programs with inconsistent and contradictory labor area definitions and their failure to provide any review of contractors' projections of job openings.

Since the USDA states it now intends to comply with the guidelines contained in the Technical Guidance Memo, defendants and plaintiffs appear to be in agreement on the correct standards to apply in the future, and thus the prospective relief granted by the court should not impose any intolerable burdens on defendants. See note 9, *supra*.

17. *Technical Guidance Memo*, at (3) Availability Analysis.

18. (g) Goals, timetables and affirmative action commitments must be designed to correct any identifiable deficiencies.

neither set forth the percentage needed to correct the contractor's deficiencies in the employment of minorities and women, nor do they commit the contractor to doing so. Apparently, the USDA's practice is to require only annual goals. By utilizing this practice, however, the USDA in fact concedes that it requires no meaningful commitment of the contractors, since it has conducted under 800 compliance reviews each year for the past three years of the more than 18,000 contractors assigned to it for supervision. At this rate, each contractor would be reviewed once every 22½ years, making the requirement of annual goals ludicrous. In addition to the lack of ultimate goals, none of the programs approved established a timetable for reaching the ultimate goal.

The USDA's answer to plaintiffs' contentions is that the regulations do not specifically require any such "ultimate goals." The OFCC, however, rejects this interpretation of the regulations which requires only annual goals, and instead requires:

(1) A goal must be established for each job group in which underutilization exists and must be designed to completely correct the underutilization. The goal must be stated as a percentage of the total employees in the job group and must be equal to the percentage of minorities or women available in the job group in the applicable labor market.

. . . . . .

(2) for each job category in which underutilization exists, a specific timetable must be established for reaching the ultimate goal in the minimum feasible time period.

*Technical Guidance Memo* at 3.

This interpretation of Revised Order Number 4 is substantially identical to what plaintiffs have claimed and is now accepted by the USDA. Hence, the USDA has virtually admitted that its failure to require these goals in the affirmative action programs approved in the past was tantamount to a violation of Revised Order Number 4.

In addition, plaintiffs contend that the annual goals system adhered to by the USDA, which allowed contractors to project the number of job openings in the forthcoming year and then to anticipate the number of minorities and women that would be hired, is inadequate even as an intermediate goal. They note that if openings are seriously underprojected, and there is considerable evidence of this in the affirmative action programs themselves,[19] when the actual job openings exceed the projections, these additional openings will not be covered by the previously set minority and female hiring goals. Thus, plaintiffs argue, to be effective the regulations must anticipate using percentage hiring goals for women and minorities, not the job openings projections of contractors. Anything less would eviscerate the requirement of section 60–2.12(g) that, "Goals, timetables and affirmative action commitments must be designed to correct any identifiable deficiencies." The USDA's practice challenged by plaintiffs as at odds with Revised Order Number 4 has since been expressly rejected by the OFCC:

Some agencies have interpreted required goals too narrowly to mean only an annual goal. . . .

(3) For each job category in which underutilization exists, the contractor

---

19. For example, Del Monte Plant 57 and Dole Company projected zero (0) job openings in every job category and therefore set no minority or female hiring goals at all. Kockos Brothers, Inc., which projected 19 new job openings from August, 1972, to August, 1973, had 63 job openings the previous year. During the first four months of the projected period, September 1, 1972, to January 1, 1973, the company hired 21 new employees, and thus had more job openings within that period than it had projected for the entire year.

must establish annual rates of hiring and/or promoting minorities and women until the ultimate goal is reached. These rates should be the maximum rates that can be achieved through putting forth every good faith effort, including the use of available recruitment and training facilities, and must not be lower than the percentage rate set in the ultimate goal. Numerical goals based on projected openings are required but cannot be used in place of percentage goals.

*Technical Guidance Memo*, Part II, at (3). Accordingly, there is no longer any question that the programs uniformly approved by the USDA were not in compliance with Revised Order Number 4.

Furthermore, the programs approved by the USDA demonstrably fail to set out any intermediate goal, any timetable, or any ultimate goal beyond the one year projections initially required. Without annual reviews, there is no question that this approach is a totally inadequate method of achieving compliance with Revised Order Number 4's requirement that contractors "put forth every good faith effort" to correct any deficiencies in utilization of minorities and women. In fact, some of the USDA pro-

grams approved for Alameda County contractors did not even set one year goals designed to achieve any progress in correcting utilization deficiencies.[20]

The USDA's failure to carry out its responsibilities under Executive Order 11246 by approving programs with these glaring inadequacies cannot be explained away by defendant Gladden's fear that percentage goals would impose inflexible and illegal quotas on the contractors. Perhaps the best indication of the USDA's failure to carry out its responsibilities is the rejection of its methods and interpretation of Revised Order Number 4 by the federal agency in charge of overall enforcement of the executive order and which promulgated the regulations—the OFCC—in its Technical Guidance Memo.

### 3. Failure to Include Required "Additional Ingredients"

Finally, plaintiffs contend that the affirmative action programs approved by the USDA in Alameda County consistently fail to include certain "additional ingredients" required in addition to the utilization analysis and goals and timetables required by Revised Order Number 4. These additional ingredients are set out in 41 C.F.R. § 60–2.13 (1973).[21]

---

20. For example, the Golden Grain Macaroni Company had projected job openings of 7 Skilled Craftsmen and 4 Operatives during 1972–1973, but did not project hiring any minorities for those positions. The Kellogg Company and Ghirardelli Chocolate Company projected minority hiring at only 20% in all their job categories.

21. § 60–2.13 *Additional required ingredients of affirmative action programs.*
 Effective affirmative action programs shall contain, but not necessarily be limited to, the following ingredients:
 (a) Development or reaffirmation of the contractor's equal employment opportunity policy in all personnel actions.
 (b) Formal internal and external dissemination of the contractor's policy.
 (c) Establishment of responsibilities for implementation of the contractor's affirmative action program.

(d) Identification of problem areas (deficiencies) by organizational units and job classification.

(e) Establishment of goals and objectives by organizational units and job classification, including timetables for completion.
 (f) Development and execution of action oriented programs designed to eliminate problems and further designed to attain established goals and objectives.

(g) Design and implementation of internal audit and reporting systems to measure effectiveness of the total program.

(h) Compliance of personnel policies and practices with the Sex Discrimination Guidelines (41 C.F.R. Part 60–20).

(i) Active support of local and national community action programs and community service programs, designed to improve the employment opportunities of minorities and women.

Plaintiffs specify four areas in which they claim the USDA programs are especially deficient: (1) commitment to, and the means for, implementing affirmative recruitment of minorities and women, 41 C.F.R. § 60–2.13(f), (i), & (j) (1973); (2) goals based in part upon the contractors' good faith efforts to train minorities and women, 41 C.F. R. § 60–2.11(a)(1)(viii), (2)(viii), 41 C.F.R. § 60–2.13(f) (1973), including in-house training programs, and use of training facilities available in the community; (3) support for community-based programs designed to improve employment opportunities of minorities and women, 41 C.F.R. § 60–2.13(i) (1973); and (4) development and implementation of internal audit and reporting systems to enable contractors to measure the effectiveness of their total programs, 41 C.F.R. § 60–2.13(g) (1973). The requirement that any affirmative action program must include these ingredients in order to comply with Revised Order Number 4 was recently affirmed by the OFCC in its Technical Guidance Memo, Part II, at (4):

> Each program must contain specific and detailed action oriented programs, including recruitment and training programs, which comply with Revised Order 4. These programs must, among other required ingredients, commit the contractor to undertake every good faith effort to contract and make use of relevant recruitment and training resources available in the community and to use its own resources for recruiting and training minorities and women to fill positions in job groups where underutilization exists. Data regarding promotable employees, community training facilities and company training facilities must be prepared by the company itself, and related to the locality.

Moreover, the USDA does not dispute plaintiffs' claim that they have consistently approved affirmative action programs which fail to contain these ingredients. Their response that they cannot compel a company to adopt any specific program does not meet plaintiffs' contention and does not justify approval of affirmative action programs which do not include concrete action oriented programs as required by Revised Order Number 4, 41 C.F.R. § 60–2.13 (1973).

## V

In conclusion, therefore, to the extent that the material facts with regard to plaintiffs' motion for partial summary judgment consist of the affirmative action programs themselves which were approved by the USDA, there is no factual dispute. The USDA does not seriously contest plaintiffs' claim that the 29 programs it approved in Alameda County were not in compliance with even the most fundamental requirements of Revised Order Number 4.

The course of the USDA's actions subsequent to the filing of this case further substantiate plaintiffs' claims that the USDA approved flagrantly inadequate affirmative action programs. After plaintiffs questioned the propriety of the USDA's initial approvals, the USDA and OFCC began a review of the 29 Alameda County contractors' affirmative action programs. By mid-March, 1974, this review resulted in issuance of eight show cause notices and six conciliation meetings were conducted. Thus, even the USDA, upon closer analysis, recognized that its earlier approvals were in error. Ordinarily, this subsequent review activity would be an encouraging sign indicating that future compliance with the mandates of Revised Order Number 4 might be achieved without judicial intervention. However, the affidavit of William Gladden, *supra*, shows that these auspicious developments have been achieved only by distorting the USDA's entire review program. Since February, 1972, only three show cause orders have been di-

---

(j) Consideration of minorities and women not currently in the work force having

requisite skills who can be recruited through affirmative action measures.

rected by the USDA to companies unrelated to the 29 Alameda County contractors whose programs are the subject of this litigation; all the show cause orders issued in 1974 have been issued to the Alameda County contractors. Hence, this distortion of the USDA's efforts cannot be taken to demonstrate that the previous course of pro forma review of affirmative action programs so amply demonstrated by plaintiffs will not continue in the future when the attention directed by this lawsuit is removed.

■ Therefore, injunctive relief is appropriate as a means of assuring compliance by defendants with their own regulations, and necessary because there is a clear danger that the illegal and improper approvals of noncomplying affirmative action programs will continue unless defendants are restrained from repetition of their past unlawful review, and because there is no adequate remedy at law or any remedy of any kind whatsoever which can correct defendants' actions.

Accordingly, the court will direct entry of partial summary judgment in favor of plaintiffs regarding the 29 Alameda County contractors whose programs were previously approved by the USDA. Defendants Butz and Gladden will be restrained from approving affirmative action programs which do not contain adequate utilization analyses, goals and timetables, and action oriented programs. These defendants will be further ordered to rescind their approval of those affirmative action programs of contractors that plaintiffs have shown to contain serious and demonstrably inadequate elements required by Revised Order Number 4 and to institute enforcement proceedings against those companies. Finally, to insure compliance with the court's mandate, until further order of the court defendants will be required to submit to the court and counsel for plaintiffs copies of any additional affirmative action programs approved by the USDA for Alameda County contrac-

tors along with supporting papers within 15 days of their approval.

Plaintiffs shall submit findings and an appropriate order in accordance with the court's ruling.