608 F.2d 1319
 21 Fair Empl.Prac.Cas. 605,
21 Empl. Prac. Dec. P 30,443
LEGAL AID SOCIETY OF ALAMEDA COUNTY; Stephen E. Ronfeldt;
Linda Castillo; Delores Luster; John Stafford;
Isadore Payne; Western Regional Job
Council, Plaintiffs-Appellees,
v.
Peter J. BRENNAN, Secretary of the United States Department
of Labor; Philip Davis, Acting Director of the Office of
Federal Contract Compliance; Earl L. Butz, Secretary of the
United States Department of Agriculture; William Gladden,
Chief, Contract Compliance Division, Office of Equal
Opportunity, United States Department of Agriculture, Defendants,
Chamber of Commerce of the United States of America, on
behalf of its affected members,
Defendants-Intervenors-Appellants.
LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs-Appellees,
v.
NCC FOOD CORPORATION, Defendant-Intervenor-Appellant.
LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs-Appellees,
v.
DEL MONTE CORPORATION, Defendants-Intervenors-Appellants.
LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs-Appellees,
v.
CPC INTERNATIONAL, Defendant-Intervenor-Appellant.
LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs-Appellees,
v.
CARNATION COMPANY, H. J. Heinz Company, Sunshine Biscuits,
Inc., Bell Brand Foods, Inc.,
Defendants-Intervenors-Appellants.
LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs-Appellees,
v.
GRANNY GOOSE FOODS, INC., Defendant-Intervenor-Appellant.
LEGAL AID SOCIETY OF ALAMEDA COUNTY et al., Plaintiffs-Appellees,
v.
GOLDEN GRAIN MACARONI CO., and its division, Ghirardelli
Chocolate, Inc., Defendants-Intervenors-Appellants.
 Nos. 74-2954, 74-3013 to 74-3015, 74-3234, 74-3250, 74-3317
and 74-3391.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 4, 1979.
 
 Noble K. Gregory, Pillsbury, Madison & Sutro, San Francisco, Cal., Gerard C. Smetana, Borovsky, Smetana, Enhrlich & Dronenberg, Washington, D. C., Maureen E. McClain, San Francisco, Cal., for Carnation Co., et al.
 Mark L. Gross, Dept. of Justice, Washington, D. C., Russell W. Galloway, Jr., Oakland, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING, WALLACE and KENNEDY, Circuit Judges.
 BROWNING, Chief Judge:
 
 
 1
 As a condition of doing business with the federal government, larger federal contractors are required to develop "written affirmative action compliance programs" designed to further equal employment opportunity. The contents of these programs are specified by regulation. 41 C.F.R. §§ 60-1.40, 60-2.10 to 13.
 
 
 2
 Several Black residents of Alameda County, California and organizations representing them, brought this suit against responsible federal officials, alleging they had failed to discharge their duty to ensure the maintenance by food processing contractors of adequate affirmative action programs. The district court granted partial summary judgment and injunctive relief. Legal Aid Society v. Brennan, 381 F.Supp. 125 (N.D.Cal.1974).
 
 I.
 A.
 
 3
 Executive Order 11246 requires government contracting agencies to include in most federal and federally-assisted contracts dual covenants (1) that the contractor "will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin," and (2) that the contractor will "take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, or national origin."[1] This suit concerns the second covenant the "affirmative action" obligation which was added to the "nondiscrimination" obligation in 1961 in response to "an urgent need for expansion and strengthening of efforts to promote full equality of employment opportunity . . . ." 26 Fed.Reg. 1977 (March 8, 1961).
 
 
 4
 The duty to enforce Executive Order 11246 is vested in the Secretary of Labor, who is authorized to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes" of the Order.[2]
 
 
 5
 Pursuant to his rule-making authority, the Secretary has delegated enforcement responsibility to the Office of Federal Contract Compliance Programs (OFCCP).[3] Until recently, this office in turn delegated day-to-day enforcement to various "compliance agencies." USDA was designated as the compliance agency for non-construction contractors in the food production and processing industry.[4]
 
 
 6
 The Secretary of Labor has issued regulations detailing the manner in which contractors are to fulfill the affirmative action commitment. Each contractor with 50 or more employees and a federal contract of $50,000 or more is required to develop a written affirmative action program for each of its establishments. 41 C.F.R. § 60-1.40. The contents of the programs are specified in Revised Order No. 4, 41 C.F.R. Part 60-2.[5] Acceptable programs include two basic elements: (1) "an analysis of areas within which the contractor is deficient in the utilization of minority groups and women," and, where the analysis discloses deficiencies, (2) "goals and timetables to which the contractor's good faith efforts must be directed to correct the deficiencies . . . at all levels and in all segments of his work force where deficiencies exist." 41 C.F.R. § 60-2.10. The factors to be considered in analyzing minority and female utilization and in formulating goals and timetables for correcting underutilizations are spelled out in 41 C.F.R. §§ 60-2.11 and 2.12. Certain additional ingredients required of acceptable affirmative action programs are set out in 41 C.F.R. § 60-2.13. Revised Order No. 4 also details the procedures compliance authorities are to follow in securing corrective action when a contractor's program fails to satisfy the specified criteria and in imposing sanctions if corrective action is not forthcoming. 41 C.F.R. § 60-2.2.
 
 B.
 
 7
 Appellees' complaint contained two central allegations. First appellees charged that responsible USDA officials failed to review the affirmative action programs of a majority of federal contractors within USDA's compliance jurisdiction.[6] This portion of the case is still pending below. Second, appellees alleged that where compliance reviews were undertaken, USDA officials regularly approved programs that did not comply with Revised Order No. 4. In discovery proceedings in support of the second claim, appellees obtained the affirmative action programs of 29 contractors in Alameda County, California, that had been reviewed and approved by USDA from August 1972 through January 1973. These included the programs of all Alameda County contractors within USDA's compliance jurisdiction. Based upon these programs and letters from the officials approving them, appellees moved for partial summary judgment on the complaint that USDA officials had regularly approved noncomplying programs. Appellees asked that the officials be restrained from approving noncomplying programs, and that they be required to rescind approval of deficient plans and initiate enforcement proceedings against companies submitting these plans.
 
 
 8
 The district court granted appellees' motion. It concluded that components of affirmative action programs that were mandated by Revised Order No. 4 were nonetheless absent from the programs approved by the officials. It declared ten specific programs to be violative of the regulations, and therefore illegally approved. The court enjoined USDA officials from approving programs that did not comply with Revised Order No. 4. They were ordered to rescind approval of the ten noncomplying programs, to issue show cause notices to the contractors submitting them, and to seek sanctions against any contractor that did not develop and implement a complying program.[7]
 
 
 9
 The federal officials filed, then withdrew, a notice of appeal, and have appeared in this court in support of the judgment.
 
 
 10
 The appellants are contractors whose affirmative action plans formed the basis for the court's order. The plans of four appellants were among the ten specifically declared unacceptable.[8]
 
 
 11
 Appellants were not parties to the proceedings below. After partial summary judgment was granted, appellants sought to intervene generally for the purpose of reopening the proceedings. The district court denied their motion, but permitted intervention for the purpose of appeal.
 
 
 12
 Appellants present five issues. First, they contend that approval of affirmative action plans by a compliance agency is not subject to judicial review or remedies, at least not at the behest of these appellees. Second, they contend that judicial review, if available, was premature because appellees had not exhausted administrative remedies. Third, they argue that they were entitled to participate in the proceedings below, and that entry of summary judgment without their presence deprived them of due process. Fourth, they contend that in finding the affirmative action programs inadequate and in formulating the decree, the district court relied upon standards that were erroneous in substance and not lawfully promulgated. Finally, they argue that the decree imposes hiring and promotion quotas in violation of the Constitution and of Title VII of the Civil Rights Act of 1964.
 
 
 13
 The federal appellees argue that appellants lack the requisite interest to maintain this appeal. Appellants counter that their interests were sufficient not only to permit intervention to appeal but also to require that the judgment be set aside because they were not parties to the proceedings in the court below. We turn first to these contentions.II.
 
 A.
 
 14
 The federal appellees argue that appellant contractors have no appealable interest in the decision below because the district court's order is directed only to the manner in which the federal appellees carry out their regulatory responsibility. They further contend that the interests of appellants can be fully protected in the administrative process, which affords contractors the right to justify their compliance efforts before sanctions for noncompliance may be imposed.
 
 
 15
 Post-judgment intervention for purposes of appeal may be appropriate if the intervenors act promptly after judgment, United Airlines, Inc. v. McDonald, 432 U.S. 385, 395-96 & n. 16, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); Pellegrino v. Nesbit, 203 F.2d 463, 465 (9th Cir. 1953), and meet traditional standing criteria. United States v. Imperial Irrigation Dist., 559 F.2d 509, 521 (9th Cir. 1977).[9] Appellees do not challenge the timeliness of appellants' motion to intervene for the purpose of appeal, but question whether appellants have met the standing criteria by alleging a threat of particularized injury from the order they seek to reverse that would be avoided or redressed if their appeal succeeds.[10]
 
 
 16
 Appellants allege that if the order is implemented, appellants' past and future compliance efforts will be measured by erroneous legal standards and appellants' ability to retain current contracts and their eligibility for future contracts will be affected by those erroneous standards. The four appellants whose affirmative action programs were disapproved by the district court further allege that approval of their programs will be rescinded and show cause orders will be issued against them, leaving them the choice of preparing new programs or suffering termination of existing contracts and debarment from future contracts. These allegations reflect a "sufficiently direct threat of personal detriment," Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 62, 96 S.Ct. 2831, 2838, 49 L.Ed.2d 788 (1976), to establish standing. Appellants' interests could not be fully protected in subsequent administrative proceedings since the agency would have no authority to question the validity of the district court's interpretation of the regulations so long as the decree remained in effect.[11]
 
 
 17
 Appellees assert appellants have suffered no injury that the district court's order simply conformed to existing regulations and required the government officials to undertake only those enforcement measures they had a present duty to perform in any event. The argument addresses the merits of the action, not the issue of standing. Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); City of Chicago v. Atchison, Topeka & Santa Fe R. R. Co., 357 U.S. 77, 83-4, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).
 
 
 18
 Appellants are properly before this court as intervenors on appeal.B.
 
 
 19
 The contractor appellants argue that the interests which give them standing to appeal also required that they be joined as parties initially or be allowed to intervene, and that they be accorded notice and hearing before entry of the decree below.
 
 
 20
 Assuming appellants should have been joined as parties to the proceedings below, their presence on appeal renders harmless any defect in the party structure so far as the provisions of the decree respecting standards governing future compliance are concerned.[12] Appellants' objections to the district court's interpretation of the Executive Order and administrative regulations raise strictly legal issues subject to full review in this court. Appellants' future compliance will be judged by the agency against standards formulated after full and fair consideration of appellants' objections on this appeal.[13]
 
 
 21
 The decree also orders compliance officials to rescind approval of the ten affirmative action programs found to be defective, including the programs of four of the appellants, and to institute enforcement proceedings immediately under the applicable regulations. Appellants contend that due process, the compulsory joinder requirements of Rule 19(a), and the guarantee of intervention as of right upon timely application under Rule 24(a), precluded the court from passing in their absence upon the legality of their specific conduct. Appellees respond that the invalidated programs have been superseded in the process of annual revision and updating required by the regulations, 41 C.F.R. § 60-1.40(c), and issues relating to the process by which they were invalidated have thereby become moot. Appellants do not deny that the invalidated programs have been replaced, but argue only that forward-looking features of the decree remain. Issues relating to the latter features of the decree are fully dealt with on this appeal, as we have said. We accept appellees' undisputed suggestion that events subsequent to the district court's finding that specific programs were deficient have deprived that action of any present consequence, and vacate as moot the portion of the decree ordering rescission of approval of the condemned programs and issuance of show cause notices to the contractors submitting them.
 
 III.
 A.
 
 22
 The provisions of Revised Order No. 4, issued under Executive Order 11246, have the force of law.[14] Appellants do not disagree. They contend, however, that the terms of the Executive Order and Revised Order No. 4 are not enforceable in the courts.
 
 
 23
 Administrative action is subject to judicial review unless it is clear that such review was not to be available. Morris v. Gressette, 432 U.S. 491, 500-01, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977); Barlow v. Collins,397 U.S. 159, 166-67, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Arizona Power Pooling Ass'n v. Morton, 527 F.2d 721, 727 (9th Cir. 1975).[15] Nothing in Executive Order 11246 precludes judicial review. Indeed, the Order appears to anticipate such review by preserving, in addition to sanctions expressly authorized by the Order, remedies "as otherwise provided by law." E.O. 11246, § 202(6).
 
 
 24
 Although the Executive Order and implementing regulations place heavy reliance upon administrative expertise and discretion, not all compliance review action is committed to discretion of the agency. In these circumstances, judicial review limited to the non-discretionary aspects of agency action is appropriate. Ness Investment Corp. v. USDA Forest Service, 512 F.2d 706, 714-15 (9th Cir. 1975); East Oakland-Fruitville Planning Council v. Rumsfeld, 471 F.2d 524, 533-34 (9th Cir. 1972).[16] The regulations sought to be enforced here identify in clear mandatory terms elements that must be included in affirmative action programs before they may be deemed acceptable by compliance officials. Programs "Must include an analysis of the areas within which the contractor is deficient in the utilization of minorities and women," 41 C.F.R. § 60-2.10. This analysis "Must contain" the work force breakdown spelled out in 41 C.F.R. § 60.211, plus a utilization-availability study in which the contractor "Will consider" at least eight enumerated factors. 41 C.F.R. § 60-2.11(a)(1) (1973).[17] Programs also "Must include . . . goals and timetables," 41 C.F.R. § 60-2.10, which "Must be designed to correct any identifiable deficiencies." 41 C.F.R. § 60-2.12(g).[18] Affirmative action programs "Shall contain" the additional ingredients listed in 41 C.F.R. § 60-2.13.
 
 
 25
 There is no discretion as to the presence of these components in an acceptable affirmative action plan. Programs that lack them do not comply with Revised Order No. 4. Judicial review is available to insure that compliance officials perform their non-discretionary duty to refrain from approving plans that do not contain the elements mandated by the regulations. The remedies available under the Administrative Procedure Act setting aside unlawful program approvals, 5 U.S.C. § 706(2), and compelling unlawfully withheld agency rejection of noncomplying programs, 5 U.S.C. § 706(1) may be invoked against compliance officials who violate this duty.[19]
 
 
 26
 Relief in the nature of mandamus is also appropriate. 28 U.S.C. § 1361. In arguing to the contrary, appellants stress the informality and flexibility of the enforcement scheme under the Executive Order, pointing to its emphasis on mediation and conciliation, 41 C.F.R. §§ 60-2.2(c)(2),[20] 60-1.24(c)(2) (1973), and to the express reservation that "(n)o contractor's compliance status shall be judged alone by whether he meets his goals and timetables . . . . (but) shall be reviewed and determined by . . . his good faith efforts to make his program work . . . ." 41 C.F.R. § 60-2.14. As appellants correctly argue, areas of the administrative process so laced with discretion are traditionally shielded from direct judicial intervention. Smith v. Grimm, 534 F.2d 1346, 1352 (9th Cir. 1976); Jarrett v. Resor, 426 F.2d 213, 216 (9th Cir. 1970); Wilmot v. Doyle, 403 F.2d 811, 816 (9th Cir. 1968). But these are not the areas as to which appellees sought and obtained relief. Appellees' claim went to a threshold matter the required content of acceptable affirmative action plans. This issue is distinct from such subsequent questions as to whether a contractor is in compliance with a valid affirmative action program (to which the good faith standard is relevant), or what should be done to secure compliance once it is determined that a contractor has violated his affirmative action obligations (to which the conciliation provisions are directed).[21] Appellees seek only to "require . . . (compliance) officers . . . to perform the ministerial duty of complying with their own regulations" by disapproving programs that do not contain the elements required by the regulations. Workman v. Mitchell, 502 F.2d 1201, 1205 (9th Cir. 1974). See also Elliott v. Weinberger, 564 F.2d 1219, 1226 (9th Cir. 1977), Aff'd in part, rev'd in part sub nom. Califano v. Yamasaki, --- U.S. ----, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). For this an order in the nature of mandamus will lie. It is no bar to such relief that the court may be required to interpret Revised Order No. 4 to determine the precise scope of the agency's duties. "(O)nce the court interprets the law, the defendant's duty will become clear; the court is not telling the defendant how to exercise his discretion." Knuckles v. Weinberger, 511 F.2d 1221, 1222 (9th Cir. 1975).
 
 
 27
 Appellants rely on three Court of Appeals' holdings that Executive Order 11246 does not afford a basis for a private right of action by an employee against an employer for alleged discrimination. These cases are inapposite. Two involved suits for damages for alleged violation of nondiscrimination covenants in private employers' contracts with the government.[22] The courts held that a private right to initiate judicial enforcement of such a covenant independently of the government would be inconsistent with the enforcement scheme created by the Executive Order. The third case involved a suit by a government employee against the government as an employer, and was based primarily upon sovereign immunity.[23]
 
 
 28
 Appellees do not seek recognition of a supplemental private enforcement mechanism. They do not seek damages for specific acts of discrimination against themselves. They ask only that the court review the government's own enforcement effort against the standards established by the Executive Order and regulations. Review of this sort is an ordinary element of administrative enforcement schemes, absent clear indication to the contrary. Since the only relief sought in such a suit is that government officials be required to perform the non-discretionary duties imposed upon them by the Executive Order and regulations, the action is by definition compatible with the scheme established by the Order and regulations. The reluctance of courts to imply separate private enforcement rights from statutes or regulations which provide explicitly only for government enforcement procedures and penalties, See, e. g., Cort v. Ash, 422 U.S. 66, 78-80, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers,414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), is not applicable to such a private proceeding as this.
 
 
 29
 If the cases on which appellants rely correctly deny the right to initiate a private suit against a discriminating employer under Executive Order 11246, judicial oversight of enforcement efforts of government officials through such a suit as this becomes doubly important; without it, no remedy would be available against compliance agencies that ignore the specific requirements of the Executive Order and regulations.
 
 
 30
 The argument that sovereign immunity bars this suit is no longer available. After briefs were filed, Congress amended the Administrative Procedure Act to remove the sovereign immunity defense to judicial review of administrative action where nonmonetary relief is sought. See Pub.L. 94-574, § 1, Oct. 21, 1976, 90 Stat. 2721, Amending 5 U.S.C. § 702. The amendment is applicable on this appeal. Hill v. United States, 571 F.2d 1098 (9th Cir. 1978).
 
 B.
 
 31
 Appellant Chamber of Commerce contends that even if a private judicial remedy is available, appellees have no standing to pursue it.[24]
 
 
 32
 The standards for evaluating standing are clear. To establish an Article III case or controversy plaintiffs must allege they "personally ha(ve) suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . . that is likely to be redressed if they requested relief is granted." Gladstone, Realtors v. Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). The injury must be "fairly traceable to the defendant's acts or omissions," Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); there must be a " 'substantial likelihood' that the relief requested will redress the injury claimed." Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631, n. 20, 57 L.Ed.2d 595 (1978).[25] To sustain a favorable judgment, the allegations must be uncontroverted or proven.[26]
 
 
 33
 A fair application of the standards to this case is made difficult by the fact that appellees' standing was first questioned in a reply brief filed in this court by the Chamber of Commerce no other appellant raised the issue. Appellees' standing was not contested in the trial court the defendant officials did not deny the factual allegations of the complaint relating to appellees' standing; they did not challenge the factual or legal basis for appellees' standing either in their motion to dismiss the complaint or in their opposition to appellees' motion for partial summary judgment.
 
 
 34
 The Chamber's sole argument on standing, stated in one paragraph in its reply brief, is that contractors might refuse to contract with the government to avoid complying with the requirements of the decree, thereby rendering the decree useless and decreasing rather than increasing job opportunities for appellees an argument we reject for reasons stated below. At no point in the proceedings in this court or the court below has any party suggested that the named appellees were not injured or were unlikely to benefit individually from the decree even if the overall effect of the decree was to make more jobs available for minority job-hunters in Alameda County. No doubt the record would be substantially more complete had appellees been called upon to marshall the facts and law in support of standing in response to a timely challenge to standing. Taking the record as it is, however, enough appears to justify the conclusion that standing requirements were satisfied.
 
 
 35
 The complaint alleged that the defendant federal officials approved affirmative action programs which did not comply with Revised Order No. 4. The distinct court agreed, finding the officials had consistently approved programs lacking adequate work force composition analyses and statements of goals and timetables to correct underutilizations of minorities and women.[27] The complaint further alleged that as a result of the improper approval of affirmative action programs individual appellees were denied employment opportunities with contractors for whom appellees desired to work. Second Amended Complaint PP 3C-F, 23D, 42. Each individual appellee alleged that he or she is an unemployed black resident of Oakland (in Alameda County), and that he or she sought employment unsuccessfully with identified contractors and was turned away on the basis of race and/or sex. Appellee Castillo, for example, alleged that she desired employment generally with contractors within the defendant officials' compliance jurisdiction, that she sought employment with the Chiodo Candy Company and was turned away without being asked the type of job she sought or her qualifications, and that she was denied an opportunity to apply for work because of her race and sex. On the basis of these uncontested allegations and the record as a whole, the district court concluded that appellees "who have unsuccessfully sought jobs with federal contractors" had standing because they were "directly and adversely affected by the failure of (defendant officials) to carry out their monitoring duties (with respect to approval of affirmative action programs) under Executive Order 11246."
 
 
 36
 Two established rules of construction have significant bearing upon the adequacy of these allegations and findings. The allegations are to be treated as admitted since not denied, Fed.R.Civ.P. 8(d); and the allegations and supporting evidence are to be construed in favor of the appellees the parties asserting standing, See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Moreover it is unnecessary to examine the standing of all appellees so long as one had standing to secure the requested relief. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). We conclude that appellee Castillo had standing.
 
 
 37
 The denial of employment opportunities to Castillo satisfied the requirement of "actual injury." It must also appear that this injury was caused by the federal officials' failure to enforce the executive order. Such causation is established if actual job opportunities would have arisen had the federal officials refused to approve deficient affirmative action programs. Fairly read, the complaint alleged and the district court found that, absent approval of deficient programs, additional minority job opportunities would have been available with the contractors from whom appellees sought employment. The substance of appellee Castillo's claim was that she was unable to obtain consideration for suitable work with the Chiodo Candy Company because enforcement officials had not required goals and timetables to remedy the underutilization of women and blacks in the company's work force. A contemporary compliance review of the Chiodo work force showed that although minority persons constituted 9.4% Of the area labor force, Chiodo had no black employees in the service worker category, one black among its 30 unskilled employees (laborers), none in the semi-skilled category (operatives), and none among its office and clerical workers or in management positions. Only in the skilled craftsman category did it have substantial black representation (five of 19 employees). Had compliance officials required implementation of an affirmative action plan containing the goals and timetables appellees contend were required, it is more than purely speculative that Chiodo would have been seeking qualified minority applicants to correct the evident company-wide underutilizations. Moreover, contemporary compliance reviews reflected underutilizations of blacks by 70% Of the Alameda County food processing contractors, and systematic underutilization of blacks both overall and in every or virtually every job category by more than a third of such contractors.[28] There is a substantial probability that enforcement of the decree against these contractors would have opened new job opportunities in every category for black persons generally and for Castillo specifically. This evidence together with the uncontradicted allegations of the complaint were sufficient to show that appellee Castillo's injury was "fairly traceable" to the challenged approval of deficient affirmative action programs. Castillo must also show a substantial probability that the relief sought will remedy the alleged injury. When a plaintiff has established the requisite causation, the court usually may infer that correction of defendant's improper conduct will relieve the injury caused thereby. See Gladstone, Realtors v. Bellwood, supra, 99 S.Ct. 1601 at 1608; Duke Power Co. v. Carolina Environmental study Group, supra, 438 U.S. at 74, 98 S.Ct. 2620. A properly functioning enforcement authority can require, by force of sanction, that contractors within its jurisdiction comply with their own affirmative action programs. If Castillo's claims have merit, it is substantially probable that concrete job opportunities for minority applicants will arise with Chiodo and other identified contractors in the same area in every or virtually every job category, from unskilled labor through high level management.[29]
 
 
 38
 Whatever specific level of skills or qualifications Castillo has, some work opportunity for which she is qualified will likely materialize with these identified employers in the area in which she desires to work. This is sufficient to establish standing. Compare Arlington Heights v. Metropolitan Housing Development., 429 U.S. at 264, 97 S.Ct. 555. Appellee need not prove she is bound to be selected for the new opportunities over all others. Like the individual plaintiff in Arlington Heights, she need show only that her "quest" for a desired employment opportunity for which she could have competed was "thwarted" by the actions complained of, and that the opportunity will likely materialize thus allowing her to compete for it if the defendants act as required by the decree. Cf. id.
 
 
 39
 The argument advanced by the Chamber of Commerce the only objection to standing actually raised by any party is all but frivolous. The Chamber does not suggest that appellees were not injured nor that the decree, if complied with, would not have alleviated this injury. The Chamber's argument is that the contractors might elect to forego their contracts with the government rather than comply with affirmative action programs of the kind appellees assert to be required, and if they did so the injury to appellees would persist. The record reflects no substantial additional cost or other factor that might have led the contractors to abandon existing and presumably profitable contracts with the government, and accept debarment from future contracts, rather than correct deficiencies in their affirmative action programs. On the contrary, the record suggests both that the increase in the available labor supply that would have resulted from elimination of discrimination against women and minorities would have reduced the contractors' costs, and that the opportunity to contract with the government was of great value to the contractors.[30] Compare Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 43-44, 96 S.Ct. 1917, 1926-27, 48 L.Ed.2d 450 (1976).
 
 
 40
 Castillo and the other appellees also satisfy the prudential limitations on standing. Like the individual plaintiff in Arlington Heights, appellees assert more than a generalized grievance shared in equal measure by many others. Appellees' injury as minority job seekers among the Alameda County contractors is "peculiar to (themselves) or to a distinct group of which (they are) a part." Gladstone, Realtors v. Bellwood, 441 U.S. at 100, 99 S.Ct. at 1608. They assert their own rights, not those of third parties. Id.[31] As set forth in part IIIA of this opinion, plaintiffs have a right to seek judicial relief under Executive Order 11246 and Revised Order No. 4. Warth v. Seldin, supra, 422 U.S. at 500, 95 S.Ct. 2197.
 
 IV.
 
 41
 Appellants argue the district court acted prematurely by granting relief without requiring appellees to exhaust the administrative remedy available under 41 C.F.R. § 60-1.21 Et seq. (1973). These provisions apply to complaints by employers, or applicants for employment, against individual employers for alleged acts of discrimination violating the employer's contractual obligations to the government.[32] Although the complaint in this case alleges such acts as the immediate source of the "distinct and palpable injury" to individual appellees essential to standing, these acts are not the primary target of the litigation. The complaint is directed instead at the ultimate cause of appellees' injury the systematic approval by government officials of affirmative action programs that did not contain the provisions mandated by the regulations to expose and eliminate discriminatory employment practices. Appellees seek a declaration of the standards by which the adequacy of affirmative action plans must be judged and a declaration of the duties of compliance officials in implementing those standards. The administrative procedures to which appellants point are not designed for processing claims of this sort or to provide relief of this scope. With respect to this major aspect of appellees' claim, there was no administrative remedy to be exhausted. Rosado v. Wyman, 397 U.S. 397, 406 & n. 8, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).[33]
 
 
 42
 Moreover, even if the complaint procedures were applicable to appellees' primary claim, we would not reverse because appellees failed formally to exhaust them. This is not a case in which exhaustion of administrative remedies is required by statute as a prerequisite to judicial intervention. As applied here, the requirement that administrative remedies be exhausted is a judicially created doctrine to be employed in the manner that best serves the competing interests of the court, the agency, and the aggrieved individual in the circumstances of the particular case. Montgomery v. Rumsfeld, 572 F.2d 250, 253-54 (9th Cir. 1978). None of the interests served by the exhaustion requirement would be advanced by a reversal in this case.
 
 
 43
 The private appellees did not deliberately flout the administrative process. It is questionable whether the formal remedy provided by the regulations was applicable to any part of appellees' claims. Appellees submitted their grievance to the agency by informal means before filing suit, and the agency ruled against them on the merits, finding the affirmative action programs acceptable. After litigation was commenced, the district court, following the procedures approved in State of Washington v. Udall, 417 F.2d 1310, 1319 n. 14 (9th Cir. 1969), required the private appellees to present their claims to compliance officials a second time, but to no avail.[34] Thus agency officials were afforded an opportunity to correct their errors, to make their expertise available, and to develop an administrative record for review, See Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and declined to do so. Moreover, as defendants in this litigation, responsible officials provided the court with the counsel of their experience and expertise to the extent expertise was relevant. They participated actively in the proceedings below and made their views as to the correct construction of the regulations known to the court. Finally, no factual determinations were involved for which agency procedures or creation of an administrative record could have been especially useful. See McGee v. United States, 402 U.S. 479, 485, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971). The allegation was that the responsible agency officials approved affirmative action programs that were facially inadequate in light of the Executive Order and regulations. Only the documents themselves were relevant. Thus, while resolution of some charges of affirmative action clause violations might require detailed fact-finding and record-building for example, a charge that the contractor had not sought in good faith to implement his affirmative action program the court in this case was not disadvantaged by the lack of formal agency complaint proceedings below.[35]
 
 V.
 
 44
 The legitimacy of the standards applied by the district court in evaluating affirmative action programs and in formulating the decree is challenged on procedural grounds.
 
 
 45
 The district court concluded that compliance officials approved affirmative action programs that were in violation of Revised Order No. 4 in one or more of the following respects: (1) they contained inadequate utilization analyses, 41 C.F.R. § 60-2.11; (2) they failed to establish adequate goals and timetables designed to correct underutilization of minorities and women within the minimum period necessary, 41 C.F.R. §§ 60-2.12, 60-1.20(b); and (3) they failed to include the required additional ingredients listed in 41 C.F.R. § 60-2.13.
 
 
 46
 In the course of its analysis, the court referred to Technical Guidance Memo No. 1, issued to compliance agencies "to give specific guidance on the proper interpretation of certain selected issues that have been or continue to be raised regarding Revised Order 4."[36] Appellants contend that as used by the district court Technical Guidance Memo No. 1 was a legislative rule having a substantial impact upon the rights and obligations of federal contractors, and was invalid because not issued pursuant to the rule-making procedures of 5 U.S.C. § 553, citing Texaco, Inc. v. FPC, 412 F.2d 740, 745 (3d Cir. 1969), and related cases. Appellees respond that Technical Guidance Memo No. 1 is an interpretive rule exempt from notice-and-comment requirements under subsection (b)(A) of 5 U.S.C. § 553. See, e. g., Energy Reserves Group, Inc. v. Department of Energy, 589 F.2d 1082 (Em.App.1978).
 
 
 47
 We need not decide whether the Technical Guidance Memo is to be classified as a legislative rule and, if so, whether it was lawfully issued. Although the district court found support for its holding in the Technical Guidance Memo (381 F.Supp. at 135-39), the court also concluded that reference to the Memo was not necessary to the decision of this case (381 F.Supp. at 135-36 n. 16). We agree. It is clear without reference to the Memo that appellee officials repeatedly approved affirmative action programs that failed to satisfy the fundamental requirements of Revised Order No. 4.
 
 
 48
 Although approved by compliance officials, none of the affirmative action programs contained an analysis of all eight factors specified in Revised Order No. 4, 41 C.F.R. § 60-2.11, for determining underutilization in any job category.[37] Most of the programs failed to establish goals and timetables designed to correct the underutilization of minorities and women, 41 C.F.R. § 60-2.12(g), in a manner that would assure the "prompt achievement of full and equal employment opportunity." 41 C.F.R. § 60-1.40(a). The goals set forth in the programs neither established long-range targets to complete the correction of underutilizations, 41 C.F.R. § 60-2.12(e), nor committed the contractor to eradicating underutilizations within any period of time, 41 C.F.R. §§ 60-2.12(d), 60-1.20(b). The annual numerical goals of a number of the programs rested on unexplained underprojection of job openings anticipated by the contractor for the forthcoming year.[38] All the programs failed to contain one or more of the "additional ingredients" required by 41 C.F.R. § 60-2.13, including development and implementation of affirmative action recruiting programs for minorities and women, 41 C.F.R. § 60-2.13(f)(j), plans for support of community-based programs designed to improve employment opportunities for minorities and women, 41 C.F.R. § 60-2.13(i), and development of internal audit and reporting systems for measuring the effectiveness of the program, 41 C.F.R. § 60-2.13(g).
 
 VI.
 
 49
 Appellants object that certain provisions of the decree are at variance with the Executive Order and implementing regulations.
 
 
 50
 The court ordered compliance officials to approve only affirmative action programs containing the utilization analyses, goals and timetables, and additional ingredients called for by Revised Order No. 4. The decree imposes specific requirements with respect to each of these components. The utilization analysis in each affirmative action program must compare, separately for each set of similar jobs, the percentage of women and of each of specified minority groups in the contractor's existing work force with the percentage of available women and members of each minority group in the applicable labor area. The applicable labor area must be defined as either the city, county or Standard Metropolitan Statistical Area, depending upon which of the three has the highest minority population, unless the contractor justifies use of an area with fewer minority residents.[39] The decree requires that an ultimate goal be set for each job group at least equal to the percentage of women and minority workers in the job group available in the applicable labor market; that a minimum feasible period be established for achieving this goal; and that interim percentage hiring rates be fixed and remain in effect until that underutilization is completely corrected.[40] Each program must contain specific and detailed action-oriented recruitment and training programs.[41]
 
 
 51
 Appellants object that the decree requires compliance officials to apply rigid standards and criteria in testing the adequacy of the utilization analysis, goals and timetables, and compliance programs in affirmative actions plans, and that this is inconsistent with Revised Order No. 4 which imposes flexible standards and leaves determinations of compliance largely to the discretion of compliance officials. Appellants misread the regulations and the decree.
 
 
 52
 Appellants argue, for example, that the regulations do not require affirmative action programs to contain "ultimate goals" for female and minority utilization as distinguished from annual or interim goals, or indeed, no goals at all; and that the regulations do not require goals tied to the percentage of available women and minorities in the job groups or in the labor pool, as distinguished from flexible goals or goals keyed to a lower level that is more practical in the particular circumstances.
 
 
 53
 The regulations do not explicitly require that ultimate goals be fixed, but they do so by inescapable implication. Goals are to be directed toward achieving "Full and equal employment opportunity." 41 C.F.R. § 60-1.40(a) by correcting "Any identifiable deficiencies" in female or minority utilization. 41 C.F.R. § 60-2.12(g). Affirmative action programs must be "result-oriented," and the result to which they are to be directed under the current regulations is not merely "to increase materially the utilization of minorities and women" as it once was, 41 C.F.R. § 60-2.10 (1973) but "to achieve prompt and Full utilization of minorities and women" in deficient segments of the contractor's work force. 41 C.F.R. § 60-2.10 (1978). Goals that must be stated in terms of "full utilization" and correction of "any deficiencies" can hardly be less than ultimate goals.[42]
 
 
 54
 Similarly, although the regulations do not state in so many words that acceptable ultimate goals must reflect a level of female and minority employment in the contractor's establishment at least equal to the percentage of women and minorities available in the job group in the contractor's labor area, no other inference is consistent with what the regulations do state. Under the regulations, goals in affirmative action programs are designed to correct underutilizations. 41 C.F.R. § 60-2.12(g). Underutilizations are "fewer minorities or women in a particular job group than would reasonably be expected by their availability." 41 C.F.R. § 60-2.11(b). Availability figures are to reflect only qualified workers reasonably available in the relevant labor pool. Id. It follows that, absent discrimination utilization will not be less than availability, and that to correct underutilization goals must be set to achieve parity with the level of available women and minority workers in the relevant labor pool. To say that compliance officials may accept employment goals lower than the level of qualified women or minority workers in the relevant labor area, as appellants do, is inconsistent with the simple central canon of the regulations that underutilization must be corrected.[43]
 
 
 55
 This analysis of the decree and the regulations also suggests the error in appellants' argument that by determining underutilization and setting goals and hiring rates on the basis of a comparison of percentages of women and minorities in job categories in a contractor's work force and in the relevant labor area, the decree substitutes a rigid mathematical formula for the flexible determination encompassing all relevant factors contemplated by the regulations. The percentage of women and minorities available in a contractor's work force is to be determined by a consideration of the eight variables specified in the regulations, including, as noted above, possession of the necessary skills for the particular job category. The same is true of the determination of the percentage of such persons available in the work force in the relevant labor area. The comparison of percentages is mechanical, but the percentages to be compared are computed on the basis of the full range of variables specified in the regulations.
 
 
 56
 Appellants also argue that the decree substitutes a rigid definition of the relevant labor area for flexible guidelines in Revised Order No. 4. The regulations require that the contractor's availability analysis account for potential minority employees in the area "surrounding (his) facility," "in the immediate labor area," and "in an area in which (he) can reasonably recruit." 41 C.F.R. § 60-2.11(b)(1)(i)-(v), (2)(i)-(v). The decree provides that a program which adopts a labor area having a lower minority population than the highest in three standard geographical statistical units (Standard Metropolitan Statistical Area, County, and City) "must be rejected unless the program provides an appropriate written justification for the use of such areas."[44] This provision of the decree does not displace the regulatory standard. It simply provides a triggering mechanism for requiring a more explicit demonstration on the written record that the standard has been met when it appears that the boundaries of the labor market may have been skewed to exclude minority workers.
 
 
 57
 The district court found that compliance officials repeatedly approved affirmative action programs containing over or under-inclusive labor area definitions which minimized minority availability. 381 F.Supp. at 135. Requiring a full written exposition in the affirmative action program of the justification for the boundaries drawn, when the circumstances suggest manipulation, will make it more difficult for compliance officials to approve noncomplying programs in the future, and easier to detect abuses if they occur. At the same time, the power of the agency to determine the appropriate labor market by careful analysis of the commuting distances, communications channels, and related factors, remains unimpaired. If the written justification satisfies compliance officials that the portions of the municipal unit with the highest minority population are beyond reasonable commuting or recruiting range, for example, a more limited labor area may be approved though its minority population is lower.
 
 
 58
 This provision of the decree reflects an appropriate exercise of the court's power, in fashioning a remedy on administrative review, to "adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939). The court's power is broad, so long as the court acts "within the bounds of the (regulation) and without intruding upon the administrative province." Id. The decree violates neither the language of Revised Order No. 4 nor the "administrative province" of compliance authorities. Cf. Mitchell v. DeMario Jewelry, 361 U.S. 288, 290-92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); Indiana & Michigan Electric Co. v. FPC, 163 U.S.App.D.C. 334, 344, 502 F.2d 336, 346 (D.C. Cir. 1974).
 
 
 59
 Finally, basing goals on availability levels does not restrict administrative flexibility "in deciding when compliance has been achieved," as appellants argue. However the goals are stated, they remain only "targets reasonably attainable by means of applying every good faith effort" by the contractor. 41 C.F.R. § 2.12(e). Compliance is measured by good faith efforts to attain them, not by whether they are realized. 41 C.F.R. § 2.14. The decree does not alter this key tenet. It affects only how the goals must be set, not how they are to be met.
 
 VII.
 
 60
 Appellants argue that the provision in the decree restraining compliance officials from approving affirmative action plans unless they include hiring and promotion rates equalling the percentage of minorities and women available in the relevant labor market, requires preferential hiring and promotion on the basis of race and sex and is incompatible with section 703(a)(1), (2), (d) and (j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), (2), (d) & (j), and with the equal protection component of the Due Process Clause of the Fifth Amendment.
 
 
 61
 Appellants' argument rests on the premise that this provision of the decree requires preferential hiring and promotion of underutilized minorities and women, and consequent "reverse discrimination" against individuals not in these groups. Appellants' premise is false. Nothing in the decree or inherent in the circumstances of this case requires preferential treatment or discrimination on the basis of race or sex. We therefore need not consider when if ever racial and sexual preferences and discrimination undertaken to comply with Executive Order 11246 can be lawful under either Title VII or the Constitution. Cf. United Steelworkers of America v. Weber, --- U.S. ----, ----, 99 S.Ct. 2721, 2726, 2730, 61 L.Ed.2d 480 (1979); Id. at ----, 99 S.Ct. at 2726 (Rehnquist, J., dissenting).
 
 
 62
 The source of hiring and promotion goals and rates required by the decree to be included in acceptable affirmative action programs is significant. As noted earlier (See text at note 43), these goals and rates reflect the contractor's own determination of the percentage of minority and female workers qualified for the particular job group who are reasonably available for employment by that contractor. The goals and rates thus represent the contractor's own judgment as to the percentage of females and minority members that would be found in his work force if all available qualified persons applied for employment and if all selection processes operated in a completely nondiscriminatory manner. Given this premise, it is entirely reasonable to assume that a contractor who finds a lower percentage of women or minority members in a particular job category in his work force may well be able to correct the deficiency simply by removing obstacles to fair and equal employment, without reliance upon racial preference or discrimination.
 
 
 63
 Underutilization may be traced to failure of available women and minority workers to apply, for a variety of reasons, in the expected numbers. They may not be aware of job openings. If this is the problem, contacts may be established with local organizations, institutions, or individuals who are in a position to refer women and minority applicants; advantage may be taken of media and events through which potential women and minority applicants can be reached; and word-of-mouth recruiting by women and minority employees and applicants may be encouraged.[45] Perhaps the contractor will discover that potential applicants are discouraged by the contractor's negative image among women workers or in the minority community. If so, the problem may be solved by designating minority liaison officers, 41 C.F.R. § 60-2.22(a)(b), or by widening dissemination of the contractor's fair employment policy and practices, Id. § 60-2.21(a)(b). Or deficiency in the flow of applications from women and minority workers may be attributable to persons other than the contractor to labor unions or subcontractors, for example whom the contractor can persuade to abandon exclusionary practices. Id. § 60-2.23(b)(17).
 
 
 64
 If the contractor is attracting a balanced flow of applicants, underutilization may be the product of improper screening or selection processes. Facially objective job criteria that screen out women and minority workers disproportionately may prove to be irrelevant or only marginally related to job performance, and new and validated criteria can be substituted. Id. § 60-2.24(b); (1976) Empl. Prac. Guide (CCH) PP 1416, 1418. Or the contractor may discover that hiring personnel entertain subjective biases (conscious or not) that can be corrected by instruction or training, or by removing biased officials from the hiring process. 41 C.F.R. § 60-2.24(d).
 
 
 65
 Under most conditions these and similar steps to correct flaws in the contractor's hiring system will involve neither preference nor discrimination, yet they may be adequate to enable the contractor to comply fully with hiring and promotion goals and rates required under the decree. Of course, it may prove otherwise. Employers may find it expedient to adopt, indeed compliance officials may require, affirmative action programs that involve preference and discrimination.[46] Both administrative and judicial remedies will be available to test the lawfulness of such provisions on the basis of a specific record. But because the hiring and promotion requirements of the Revised Order and decree may lead in some circumstances to the adoption of questionable programs is not a sufficient ground for condemning the requirement on its face: "A hypothetical threat is not enough," United Public Workers v. Mitchell, 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947).
 
 
 66
 Paragraph (2) of the decree is stricken as moot. The remainder of the decree is affirmed.
 
 
 
 [1]
 Executive Order 11246 § 202, 30 Fed.Reg. 12319 (1965), As amended by Executive Order 11375, 32 Fed.Reg. 14303 (1967), 42 U.S.C.A. § 2000e note (1974)
 For a detailed history of Executive Order 11246 and its predecessors, See Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159, 168-71 (3d Cir. 1971).
 
 
 [2]
 Executive Order 11246 § 201
 
 
 [3]
 41 C.F.R. § 60-1.2 (1977), As revised, 43 Fed.Reg. 49240 (October 20, 1978)
 
 
 [4]
 OFCC, Revised Order No. 1, (October 24, 1969), Reprinted at (1970) Empl. Prac. Guide (CCH) P 17,650. The authority for designating compliance agencies was found in 41 C.F.R. § 60-1.3(d) (1973). USDA's compliance responsibilities were reassigned in 1977. The entire compliance agency system was subsequently abolished and all compliance responsibilities consolidated in OFCCP. See 43 Fed.Reg. 43572 (September 26, 1978), Reprinted at (1978) Empl. Prac. Guide (CCH) P 4380
 
 
 [5]
 Revised Order No. 4 first became effective in 1970. 35 Fed.Reg. 2586 (1970). Its provisions at the time the district court entered its order in this action appear at 41 C.F.R. Part 60-2 (1973). As presently modified, they appear at 43 Fed.Reg. 49240 (October 20, 1978)
 
 
 [6]
 Named as defendants were the Secretary of Labor, the Director of OFCCP, the Secretary of Agriculture, and the Chief of the Contract Compliance Division of USDA's Office of Equal Opportunity
 
 
 [7]
 The court's order also established a reporting and monitoring system requiring USDA officials to submit newly approved affirmative action programs to the court and to appellees' counsel for inspection. This part of the decree is not contested
 
 
 [8]
 Appellant Chamber of Commerce appears as a representative of various contractors
 
 
 [9]
 Since the federal defendants have acquiesced in the judgment against them, appellants must demonstrate such a stake in the outcome of an appeal that a live Article III case or controversy remains for appellate resolution. See Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv.L.Rev. 721, 753-54 (1968). If appellants satisfy this threshold requirement, they necessarily possess the interest required to support intervention under Fed.R.Civ.P. 24, as well as the required "appealable interest" in the adjudication below, See Fishgold v. Sullivan Corp., 328 U.S. 275, 281-83, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946); Seaboard Surety Co. v. United States, 306 F.2d 855, 859 (9th Cir. 1962); Shapiro, Supra at 753
 
 
 [10]
 See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Village of Arlington Heights v. MHDC, 429 U.S. 252, 260-61, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); United States v. Imperial Irrigation District, 559 F.2d 509, 517 (9th Cir. 1977)
 
 
 [11]
 To the extent appellants were admitted as permissive intervenors, they were not required to show their stake in the case could not be fully protected elsewhere. Fed.R.Civ.P. 24(b)
 
 
 [12]
 Where the judgment can be shaped to cure any prejudice to a party absent below, dismissal at the appellate stage is not required. See Provident Tradesmen Bank & Trust Co. v. Patterson, 390 U.S. 102, 111-12, 116, 119, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). See also 7 Wright & Miller, Federal Practice & Procedure: Civil § 1611 (1972); Fed.R.Civ.P. 21 (dismissals for defect in party structure disfavored)
 
 
 [13]
 Appellant Chamber of Commerce also contends that appellees lacked standing to challenge enforcement of the Executive Order by compliance officials. See Part IIIB Infra. Denial of intervention except to appeal may have foreclosed the Chamber's opportunity to contest the factual basis for appellees' standing, an opportunity not fully protected on this appeal. However, the Chamber did not appeal the denial of intervention, but only the earlier entry of summary judgment. It therefore can argue only that the court's conclusion that appellees had standing was erroneous on the record before the district court, in which appellees' claims to standing were not disputed. This argument is considered in Part IIIB Infra
 The individual contractor appellants, who have appealed the denial of intervention, do not challenge appellees' standing. Whatever interests they may have had in contesting standing in the district court are not asserted on this appeal.
 
 
 [14]
 See United States v. New Orleans Pub. Serv., Inc., 553 F.2d 459, 465-68 (5th Cir. 1977), Vacated and remanded on other grounds, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978). Provisions of the regulations governing disclosure of information secured from contractors may not be sufficiently rooted in a grant of authority from Congress to have the force of law, See Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 1718-1721, 60 L.Ed.2d 208 (1979), but there can be no doubt that the essential features of the affirmative action program reflected in the regulations promulgated in Revised Order No. 4 were effectively ratified by Congress in adopting the Equal Employment Opportunity Enforcement Act of 1972. Several frontal attacks on the OFCC goal-and-timetable enforcement system were defeated during congressional consideration of the 1972 Act. Court decisions upholding the validity of the affirmative action program under the Executive Order were before the legislators and figured prominently in the debates. See 118 Cong.Rec. 1664-72, 4918 (1972) (remarks of Sen. Javits, reprinting decision in Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir. 1971)); Id. 1386 (Sen. Saxbe); Id. 1663-64 (Sen. Ervin); 117 Cong.Rec. 32089 (Rep. Dent); Id. 31965 (Rep. Green), H.R.Rep.No.92-238, 92nd Cong., 2d Sess. (1971) (separate views of Rep. Green); Reprinted at (1972) U.S.Code Cong. & Admin.News, pp. 2137, 2176-77. In rejecting the assault on the OFCC affirmative action approach, Congress approved the exercise of executive authority to issue binding regulations regarding minority utilization. See Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U.Chi.L.Rev. 723, 757 (1972)
 Independent Meat Packers Ass'n v. Butz, 526 F.2d 228 (8th Cir. 1975), which appellants cite, is not to the contrary. That court held that Executive Order 11821 was not judicially enforceable. Executive Order 11821 requires executive agencies to evaluate the inflationary impact of major legislative proposals, rules, and regulations emanating from the executive branch. The court's conclusion that the Executive Order lacked legal force rested on the premise that the Order "was intended primarily as a managerial tool for implementing the President's personal economic policies," and had been issued as a housekeeping measure rather than pursuant to constitutional or statutory authority. 526 F.2d at 235-36. See also Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (D.C. Cir. 1965). Executive Order 11246 rests upon statutory and other congressional authorization. See United States v. New Orleans Pub. Serv., Inc., supra.
 
 
 [15]
 It is questionable whether an Executive Order could of its own force preclude judicial review of action taken pursuant to it. Congress may create regulatory bodies with lawmaking powers and insulate those bodies from judicial oversight. It does not follow that the President may do so solely by Executive Order, without congressional ratification. In any event, Executive Order 11246 rests upon statute and other congressional authorization (See note 14), and neither the President nor Congress has indicated an intent to preclude judicial review of action taken by compliance authorities under the Executive Order
 
 
 [16]
 Compare Peters v. Hobby, 349 U.S. 331, 345, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1954) ("Agencies, whether created by statute or (by) Executive Order, must of course be free to give reasonable scope to the terms conferring their authority. But they are not free to ignore plain limitations on that authority.")
 
 
 [17]
 In the most recent version of Revised Order No. 4, this provision appears in 41 C.F.R. § 60-2.11(b)(1) (1977). See 43 Fed.Reg. 49240, 49250-51 (October 20, 1978)
 
 
 [18]
 Similarly, "program(s) Shall provide . . . when there are deficiencies, (for) the development of specific goals and timetables for the prompt achievement of full and equal employment opportunity." 41 C.F.R. § 60-1.40(a)
 
 
 [19]
 Adams v. Richardson, 156 U.S.App.D.C. 267, 480 F.2d 1159 (D.C. Cir. 1973) (en banc), supports this conclusion. Adams held reviewable the alleged consistent failure of the Department of Health, Education and Welfare to enforce Title VI of the Civil Rights Act of 1964 against public school districts receiving federal funds. Appellants distinguish Adams on the ground that Title VI specifically permits a judicial role in its enforcement. Nothing in the Adams opinion suggests that HEW enforcement orders were made reviewable expressly. 480 F.2d at 1161-63. In any event, judicial review need not be expressly authorized; availability of judicial review is presumed unless clear evidence precludes it
 
 
 [20]
 In the current regulations this provision appears as 41 C.F.R. § 60-2.2(c)(3) (1977). See 43 Fed.Reg. 49240, 49250 (October 20, 1978)
 
 
 [21]
 As Revised Order No. 4 recognizes, the complex task of "transform(ing) . . . paper commitments into equal employment opportunity" requires leeway for the operation of discretion and good faith. But "developing and judging" the initial adequacy of the paper commitments can be carried out according to clearly stated criteria. 41 C.F.R. § 60-2.1
 
 
 [22]
 Farmer v. Philadelphia Electric Co., 329 F.2d 3 (3d Cir. 1964); Farkas v. Texas Instrument, Inc., 375 F.2d 629 (5th Cir. 1967)
 
 
 [23]
 Gnotta v. United States, 415 F.2d 1271, 1275 (8th Cir. 1969)
 
 
 [24]
 The Legal Aid Society of Alameda County and the Western Regional Job Council appear as representatives of the individual appellees. Their standing turns on that of the individuals they represent, Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), and is not challenged separately by appellants
 
 
 [25]
 See also Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); United States v. Imperial Irrigation District, 559 F.2d 509, 517 (9th Cir. 1977), On denial of rehearing, 595 F.2d 525 (9th Cir. 1979); Bowker v. Morton, 541 F.2d 1347, 1349 (9th Cir. 1976)
 
 
 [26]
 Article III controls not only who may have access to federal courts at the threshold of the litigation, but also who may obtain a judgment. To invoke federal jurisdiction, plaintiffs must allege facts adequate to confer standing; to obtain a judgment and remedy, plaintiffs must establish the truth of these or other adequate allegations. See Gladstone Realtors v. Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72-78, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)
 
 
 [27]
 The correctness of this finding goes to the merits and is assumed for purposes of standing. Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is considered in parts V-VI, Infra
 
 
 [28]
 Shasta Beverages had one black employee in a work force of 154, or .6% utilization. That employee was one of twenty technicians, giving that category a 5% utilization level; in all other categories utilization was zero. Carnation Company had four black employees of 316 in the work force (1.2%), with utilization at zero in several categories and no higher than 6% in any. Oscar Meyer and Heinz had no black employees at all. Rath Packing had one black employee of 48 (2%) overall and of 23 (4.3%) in the semi-skilled operatives category, all other categories showing zero utilization. Kockos Brothers showed 17 black employees of 336 (5%), all but two in the operatives category (which itself had the highest utilization (6%) in the work force). Foremost Transport had four black employees of 54 (7.4%), with underutilization in all but one category in which one of the two employees was black. Ghirardelli Chocolate had two black craftsmen and one black unskilled laborer among 73 employees (4.1%), with underutilization in all but one job category. Kilpatrick's Bakery had 15 black employees of 247 (6%), with underutilization in all but the service worker category. Safeway Stores had 37 black employees in a work force of 741 (4.9%), with zero utilization in some categories and underutilization in all others except service workers, where blacks constituted more than 41% of the work force
 Other contractors evidenced underutilization in some but not all categories. Some of these also showed underutilization in their overall figures as well. E. g., Kellogg Company (6.3% overall, with underutilization in office and clerical, craftsman, and high-level management categories); Golden Grain Macaroni (7.7% overall; underutilization in laborer, craftsman, office and clerical, and high-level management).
 
 
 [29]
 Castillo did not allege in so many words that she was qualified for specific positions which would have been available had the contractors been required to implement adequate affirmative action plans. But Castillo did allege that Chiodo turned her away "without even asking the type of job that she sought or what her qualifications were." This necessarily implied that appellee believed herself qualified to perform some work required in the company's operations, and Chiodo underutilized blacks in virtually every job category. Moreover, appellee alleged she was denied consideration for work "on the basis of" her race and sex. Since refusal to hire because of lack of qualification is not refusal to hire because of race or sex, the necessary implication of this allegation is that Castillo was not hired despite the fact that she was qualified. One who claims loss of employment solely due to racial discrimination necessarily claims to possess the requisite job qualifications
 
 
 [30]
 The Chamber does not suggest the record could have been supplemented with concrete evidence to support the Chamber's speculation about contractor withdrawal, had the Chamber had an opportunity to participate below. At any rate, the Chamber must accept the record as it stands, since the Chamber has appealed only the summary judgment and not the denial of intervention. See note 13
 
 
 [31]
 If the "zone of interests" limitation on standing survives, at least as to matters of review under the Administrative Procedure Act, See Gladstone, Realtors v. Bellwood, 441 U.S. 91, 99 S.Ct. at 1608 n. 6 (1979); Compare Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38-39 n. 19, 96 S.Ct. 1917 (1976); K. Davis, Administrative Law in the Seventies § 22.02-11 at 509-15 (1976); 13 Wright, Miller & Cooper, Federal Practice & Procedure: Civil § 3531 at 87 (Supp.1978), as a member of a minority group seeking a job with federal contractors, Castillo falls easily within the zone of interests protected by Executive Order 11246 and Revised Order No. 4
 
 
 [32]
 The complaint procedure in force when appellees began this action permitted any employee or applicant of a federal contractor to file "a complaint of alleged discrimination in violation of the equal opportunity clause." 41 C.F.R. §§ 60-1.21, 1.22 (1973). The procedure was apparently designed to handle complaints that specific employment decisions violated the nondiscrimination covenant of the employer's federal contract. Thus, the complaint must identify the contractor "committing the alleged discrimination" and must describe "the acts considered to be discriminatory." 41 C.F.R. § 60-1.23
 
 
 [33]
 Freeman v. Schultz, 153 U.S.App.D.C. 152, 468 F.2d 120 (D.C. Cir. 1972), and Hadnott v. Laird, 149 U.S.App.D.C. 358, 463 F.2d 304 (D.C. Cir. 1972), on which appellants rely, are distinguishable. In both cases, the complaint was directed at discriminatory acts of a particular contractor or contractors. The relief sought (cancellation of existing contracts and debarment from future contracts) was that authorized in such cases by the Executive order and regulations. Executive Order 11246, § 209(a) (1965); 41 C.F.R. § 60-1.24(c)(3) (1973). Hadnott did seek relief against the responsible enforcement officials, and the dissenting judge would have read the complaint as directed to the failure of these officials to perform their duty, but the majority treated the complaint as seeking relief against specific offending companies and relegated the plaintiffs to the administrative remedy available for processing such complaints. See also note 35 Infra
 
 
 [34]
 Before filing this lawsuit, private appellees requested federal officials to intensify enforcement of the Executive Order and regulations. In response, the agency conducted reviews of all Alameda County contractors within its compliance jurisdiction. The agency concluded all had acceptable affirmative action programs. After appellees filed suit, the court ordered proceedings stayed "to permit disposition of all issues herein involved at the administrative level of each of the offices affected by the complaint." Appellees submitted a detailed memorandum to the agency discussing the various areas in which appellees believed administrative enforcement of the regulations to be deficient. The agency took no action
 
 
 [35]
 These factors further distinguish Freeman and Hadnott. See note 33. Those cases involved alleged violations of the nondiscrimination clause in particular contracts. Such violations usually raise factual issues as to the relationship between the employer and the alleged discriminatee. Compare Furnco Construction Corp. v. Waters, 438 U.S. 567, 575, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Agency investigatory procedures may be especially valuable in ferreting out these facts, and the administrative record compiled by the agency may be essential to judicial review. This fact-finding and record-building were absent in Freeman and Hadnott, see, 153 U.S.App.D.C. at 155 & n. 6, 468 F.2d at 123 & n. 6; 149 U.S.App.D.C. at 362, 463 F.2d at 308. As a consequence, the reviewing court had no basis, short of hearing the testimony itself, upon which to judge whether the agency determination of nondiscrimination was justified
 Further, in this case appellees' letters and subsequent communications with the agency and their detailed informal complaint to the agency cataloging the asserted flaws in the approved affirmative action plans, together with the court's decision to stay its hand for further administrative-level negotiations, gave the agency a significantly greater opportunity to correct the asserted errors than did the single, unpursued oral complaint in Freeman, 153 U.S.App.D.C. at 153-54, 468 F.2d at 121-22, or the apparent lack of any resort to the agency at all in Hadnott. Indeed, in Hadnott there was every indication that the agency was correcting Sua sponte the errors of which plaintiffs complained. 149 U.S.App.D.C. at 360, 463 F.2d at 306.
 
 
 [36]
 The Memo was issued by the Office of Federal Contract Compliance of the Department of Labor on February 22, 1974, a few months before partial summary judgment was granted. Although the Memo has not been published, its provisions are virtually identical to those of OFCCP's Standard Contractor Review Report, Part B, § XII.B(a)-(c), published in the Federal Register three weeks after entry of the district court's order. See 39 Fed.Reg. 25655 (1974), Codified at 41 C.F.R. § 60-60.9 (1977); 43 Fed.Reg. 49240 (1978)
 
 
 [37]
 41 C.F.R. § 60-2.11(b)(1) reads:
 In determining whether minorities are being underutilized in any job classification the contractors will consider at least the following factors:
 (i) The minority population of the labor area surrounding the facility;
 (ii) The size of the minority unemployment force in the labor area surrounding the facility;
 (iii) The percentage of the minority work force as compared with the total work force in the immediate labor area;
 (iv) The general availability of minorities having requisite skills in the immediate labor area;
 (v) The availability of minorities having requisite skills in an area in which the contractor can reasonably recruit;
 (vi) The availability of promotable and transferable minorities within the contractor's organization;
 (vii) The existence of training institutions capable of training persons in the requisite skills; and
 (viii) The degree of training which the contractor is reasonably able to undertake as a means of making all job classes available to minorities.
 A similar analysis is required for utilization of women by section 60-2.11(b) (2).
 
 
 [38]
 See 351 F.Supp. at 137 & n.19
 
 
 [39]
 The portion of the decree dealing with utilization analyses provides:
 (a) Each program must contain a utilization analysis that satisfies each of the following requirements:
 (i) The analysis must include a list of all major job categories (hereinafter referred to as "job groups") in the contractor's work force and, for each such job group, a statement of the total number of male and female incumbents for each of the following ethnic groups: Blacks, Spanish-Surnamed Americans, American Indians and Orientals.
 (ii) Minority and female "availability" must be separately analyzed for each job group. The availability analysis must include a statement of the specific percentages of minority persons (stated separately for Blacks, Spanish-Surnamed Americans, American Indians and Orientals) and minority and non-minority women determined to be available in the applicable labor area for each job group.
 (iii) Whenever the percentage of total minorities or of any ethnic group exceeding 2% Of the surrounding population or of women in a job group is lower than the percentage of such persons available in that job group within the applicable labor area, the affirmative action program must specifically state that underutilization exists in that job group.
 (iv) For purposes of determining availability, the labor area must not be defined in such a way as to minimize the availability of minorities or women. In defining the relevant labor area, the contractor must set forth statistics showing the ethnic and sexual composition (including specific data for the four minority ethnic groups) of the population of the Standard Metropolitan Statistical Area, county and city in which the establishment is located and other appropriate adjacent areas. Any program which adopts a labor area which has a minority population lower than the highest of the SMSA, county or city must be rejected unless the program provides an appropriate written justification for the use of such area.
 
 
 [40]
 The goals-and-timetables portion of the decree provides:
 (b) Each program must contain goals and timetables which satisfy each of the following requirements:
 (i) An ultimate goal must be established for each job group in which underutilization exists and must be designed to completely correct the underutilization. The ultimate goal must be stated as a percentage of the total employees in the job group and must be at least equal to the percentage of minorities or women available for work in the job group in the labor market.
 (ii) For each job group in which underutilization exists, a specific timetable must be established for reaching the ultimate goal in the minimum feasible time period.
 (iii) For each job group in which underutilization exists, the contractor must establish rates for hiring or promoting the minorities and women. The rates must be stated as a percentage of new placements in the job group, and they must remain in effect (unless specifically modified on the basis of subsequent data) until the underutilization is completely corrected. The percentage rates must be the maximum rates that can be achieved through the contractor's putting forth every good faith effort, including the use of available recruitment and training facilities, and must not be lower than the percentages set in the ultimate goals. Numerical goals based on projected openings are permissible but cannot be used in place of percentage rates.
 
 
 [41]
 The action-oriented-program requirement of the decree provides:
 (c) Each program must contain specific and detailed action oriented programs, including recruitment and training programs, which comply with the requirements of Revised Order No. 4. These programs must, at a minimum, commit the contractor to undertake every good faith effort to contact and use in some concrete and specific manner relevant recruitment and training resources for recruitment and training minorities and women to fill positions in job groups where underutilization exists. Data regarding promotable employees, community training facilities and company training facilities must be prepared by the contractor itself and related to the locality.
 
 
 [42]
 As appellants note, the regulations anticipate that goals will not be established in some circumstances. For example, 41 C.F.R. § 60-2.12(k) provides that when no goal is provided the affirmative action program must detail reasons for the omission. Appellants argue that the decree conflicts with the regulations in this respect because the decree provides without qualification that "Each program must contain goals and timetables." However, it is clear from the decree as a whole, and federal appellees concede that if goals are inappropriate under the regulations in any circumstances, the exception would be equally applicable under the decree
 
 
 [43]
 In this and other respects the district court's interpretation of the regulations reflected in the decree is consistent with that found in Technical Guidance Memo No. 1. See note 36. Although we have refrained from deciding whether the Memo is a lawfully published rule having the force of law, unquestionably it reflects a construction of Revised Order No. 4 by the agency responsible for its promulgation and enforcement. As such it is entitled to weight (Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)), even though it may not be binding authority because of formal deficiencies. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)
 
 
 [44]
 See Para. (1)(a)(iv) of the decree, note 39
 
 
 [45]
 See 41 C.F.R. § 60-2.24(e). See also (1976) Empl. Prac. Guide (CCH) P 1414; Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235, 282-85 (1971)
 
 
 [46]
 See Associated General Contractors of Mass., Inc. v. Altshuler, 490 F.2d 9, 19 (1st Cir. 1973); Note, A Proposal for Reconciling Affirmative Action and Nondiscrimination Under the Contractor Antidiscrimination Program, 30 Stan.L.Rev. 803, 817-18 & n. 68 (1978); Venick & Lane, Doubling the Price of Past Discrimination: The Employer's Burden After McDonald v. Santa Fe Trail Transportation Co., 8 Loy. (Chi.) L.J. 789, 802-03 (1977); (1978) Empl. Prac. Guide (CCH) P 1354